**Max MILLER, Plaintiff-Appellant,**

v.

**SCHOOL DISTRICT NUMBER 167, COOK COUNTY, ILLINOIS, et al., Defendants-Appellees.**

**No. 73-1359.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1973.

Decided April 5, 1974.

Rehearing Denied June 18, 1974. See 500 F.2d 711.

---

R. W. Deffenbaugh, Springfield, Ill., Stephen J. Pollak, David Rubin, Washington, D. C., for plaintiff-appellant.

Rodney R. McMahan, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, PELL and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

Plaintiff, a non-tenured high school teacher, claims that the school board's decision to terminate his employment was actually motivated by disapproval of his beard and his sideburns, rather than by the admittedly sufficient reasons given to him in writing. His complaint having been dismissed on motion, the question presented on appeal is whether an allegation that a school board's employment decision was predicated on an unfavorable reaction to the appearance of an employee makes federal judicial review of that decision necessary.

Plaintiff was employed as a junior high school mathematics teacher for two years. In February of 1971, his principal recommended that he be given a contract for the following year, but at its meeting on March 15, 1971, the school board decided not to renew his contract. He was therefore given a written "Notice of Dismissal," containing an explanation of the board's decision as required by the Illinois School Code.[1] The stated reasons,[2] if true, were both sufficient and permissible in the sense that they did not offend any constitutionally protected interest.

Thereafter, plaintiff requested "an official closed hearing"; he stated that he would be represented by counsel and by the local association[3] at that hearing and that he expected the members of the board to prove their charges against him and to be subject to cross-examination. The board refused to schedule the kind of hearing plaintiff had requested, but

1. 122 Ill.Rev.Stat. § 24–11.

2. Those reasons were:
   "1. Difficulty in relating to pupils.
   2. Difficulty in relating to parents.
   3. Children expressed themselves as unable to understand your explanations and assignments.
   4. Weak in the area of class control—discipline.
   5. Performed personal work during class time rather than instructing pupils several times.
   6. Inadequate in maintaining attention of pupils.
   7. Inadequate motivation of pupils.
   8. Mastery of subject matter by class less than capability of class.
   9. Improvement in above weaknesses not sufficient for an experienced teacher after two years, to place on tenure." App. 19–20.

3. We infer that this was the Glenwood Education Association. App. 21–22.

did call a special meeting to give him an opportunity to address the board. At that meeting, plaintiff appeared with counsel and a court reporter. After a colloquy lasting about 40 minutes, plaintiff declined to address the board because the defendants refused to conduct the kind of hearing that his counsel insisted was appropriate; the meeting then aborted. Neither the transcript of that meeting, nor the correspondence between the parties, contains any reference to plaintiff's manner of dress, his beard, or his sideburns.

Plaintiff promptly filed suit in federal court claiming that he had been denied procedural due process. While his complaint was pending, the Supreme Court decided *Roth* and *Sindermann*.[4] Plaintiff then filed an amended complaint which, fairly read, asserts three different theories of recovery. First, plaintiff claims that the reasons given by the board imposed the kind of stigma upon him that required a pretermination hearing; under our decision in *Shirck II*,[5] this claim must be rejected. Second, plaintiff claims that the reasons as stated by the board were untrue and that the board's action was arbitrary in the sense that it was completely unsupported by any acceptable reason;[6] this claim is comparable to the "substantive due process" argument which we recently rejected in *Jeffries*,[7] and is therefore foreclosed by that decision.

The third claim raises an issue which we have not yet addressed squarely. Plaintiff alleges that his dismissal was for a constitutionally impermissible reason because his "mode of dress and appearance" are "protected by the Constitution of the United States."[8] Although this claim was not stressed in the district court, it was considered and rejected as insufficient.[9] The case is

---

4. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548; Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L. Ed.2d 570. Plaintiff's procedural due process claim was so clearly sufficient under the law of this circuit at the time his original complaint was filed, see Roth v. Board of Regents, 446 F.2d 806 (7 Cir., 1971) and Shirck v. Thomas, 447 F.2d 1025 (7 Cir., 1971), that there was, of course, no reason for him then to advance the claims which he subsequently asserted in the amended complaint. The omission of those claims from the original complaint raises no question about plaintiff's good faith.

5. Shirck v. Thomas, 486 F.2d 691 (7th Cir. 1973).

6. Paragraph 5 of the amended complaint reads as follows:
   "5. That on or about the 15th day of March, 1971, the Defendant Administrator and Defendant Members of the Board all individually and in concert with each other did deny the Plaintiff the attainment of tenure status for the year 1971-1972 and did terminate his employment as a teacher with the district without any reason, justification of any sort or basis in fact for such action; that there is in fact no lawful reason for the termination of the employment of the Plaintiff as a teacher; that said termination was arbitrary, capricious, unreasonable and discriminatory and without authority under law and is a denial of Plaintiff's rights without due process

of law contrary to the Fourteenth Amendment of the Constitution of the United States." App. 13–14.

7. Jeffries v. Turkey Run Consolidated School District, 492 F.2d 1, (7th Cir. 1974).

8. Paragraph 12 of the amended complaint alleges:
   "12. That the reasons for dismissal set forth in Exhibit A did not constitute the actual reason for said dismissal in that the Plaintiff was dismissed for the manner in which he dressed and for the wearing of a Vandyke beard and sideburns, which mode of dress and appearance or activities are protected by the Constitution of the United States." App. 15
   Plaintiff does not contend that the word "activities" in that allegation refers to anything other than his wearing of a Vandyke beard and sideburns. There is nothing in either the record or the briefs to suggest that he is claiming that he engaged in any other constitutionally protected activities having any relationship to the defendants' nonrenewal decision.

9. The district court's entire discussion of this issue is contained in a footnote reading as follows:
   "The plaintiff alludes to the alleged fact that the termination of his employment was caused by his exercise of his constitutional right to dress and groom himself as he chooses. The School Board has stated that the reason for his dismissal was

here on appeal from an order dismissing the amended complaint.[10]

## I.

■■ Plaintiff first reminds us that in order to withstand a motion to dismiss, the complaint need only contain "a short and plain statement of the claim." Fed.R.Civ.P. 8(a)(2). If the claim is legally sufficient, the office of plaintiff's pleading is merely to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed. 80. And, of course, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 45–46, 78 S.Ct. at 102.

Our first task, therefore, is to identify the claim which plaintiff is asserting. He has correctly pointed out in his brief that there are least three different versions of the facts that might reasonably be supported by the evidence under the allegations of the amended complaint.[11] It is important to note, however, that the alternatives he describes all raise essentially the same claim. To identify that claim as accurately as pos-

based on his performance rather than the plaintiff's mode of dress and grooming. The plaintiff has failed to present any case law to support his contention that an employee has a constitutional right to dress and groom himself in any manner he chooses irrespective of the dictates of his employer and the needs of his job. The Supreme Court has recently stated that jury bias stemming from beards and modes of dress does not reach the level of a constitutional violation. Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). Likewise, a dismissal from employment based on a bias as to the mode of dress is not a per se violation of an individual's constitutional rights or the Civil Rights Act." 354 F.Supp. 922, 925–926 (footnote).

10. At oral argument counsel for the defendants called our attention to Jablon v. Trustees of California State Colleges, 482 F.2d 997 (9th Cir. 1973) and, for the first time, advanced the argument that since plaintiff did not challenge the defendants' decision as motivated by hostility to his appearance when he appeared before the school board on March 15, 1971, he may not assert that challenge in a civil rights suit in federal court. The Ninth Circuit requires exhaustion of State remedies which are "prospective," in the sense that they may forestall a possible future constitutional deprivation. See Whitner v. Davis, 410 F.2d 24, 28–29 (1969) ; Toney v. Reagan, 467 F.2d 953, 956–957 (1972), cert. denied, sub. nom. Mabey v. Regan, 409 U.S. 1130, 93 S.Ct. 951, 35 L.Ed.2d 263. The Ninth Circuit requirement is an exception to the general rule that exhaustion is ordinarily unnecessary in § 1983 litigation ; see Gibson v. Berryhill, 411 U.S. 564, 574–575, 93 S.Ct. 1689, 36 L.Ed.2d 488 ; see also Marshall, J., concurring, at 581, 93 S.Ct. 1689, 36 L.Ed.2d 488. Even if we were to apply the Ninth Circuit exception in this Circuit, we are not at all sure that it would defeat plaintiff's claim since that court has not considered the adequacy of the limited hearing the defendants offered to this plaintiff. In all events, we do not regard defendants' belated procedural argument as jurisdictional, and therefore do not consider it because its first assertion was untimely.

11. At pages 11–12 of his brief, plaintiff states :

"The amended complaint also averred that plaintiff had been dismissed 'for the manner in which he dressed and for the wearing of a Vandyke beard and sideburns.' Many different sets of facts could be proven in support of his claim: for example, that plaintiff was dismissed (1) because he wore three-piece blue suits, with sideburns at the middle of his ears, and a neatly clipped Vandyke beard; (2) because he wore sports jackets and slacks, rather than suits, with three-inch sideburns and a half-inch Vandyke beard; or (3) because he wore t-shirts and faded levis, with sideburns which covered most of his face and an ill-trimmed Vandyke beard which covered the rest. The district court did not consider anywhere in its opinion the possibility that plaintiff might prove that he dressed as examples (1) or (2) suggest. Rather, the court read the complaint as alleging that plaintiff had a 'constitutional right to dress and groom himself in any manner he chooses irrespective of the dictates of his employer and the needs of his job' (App. 41). But plaintiff would only had to have made such an allegation were the third set of facts the ones he sought to prove and, plainly, no such facts were pleaded."

sible, and with deference to the rule that we must assume that plaintiff can prove a set of facts which will support that claim, it is important to put to one side certain claims that plaintiff is not advancing.

He is not claiming that his mode of dress and his Vandyke beard were intended to convey a specific message comparable to that signified by the black arm bands protected by the rule of Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731.[12] If that were plaintiff's claim, it certainly would have been disclosed in the pleadings, the abortive meeting with the school board, or in the briefs or argument here.[13] Nor is plaintiff claiming that he was dismissed for speaking out on an issue of public importance. Cf., Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811; Donahue v. Staunton, 471 F.2d 475 (7th Cir. 1972); or because of his race, religion, or political affiliation cf. Illinois State Employees Union v. Lewis, 473 F.2d 561 (7th Cir. 1972). Plaintiff does not suggest that his mode of appearance was connected with his racial or ethnic identity. See Justice Field's opinion in Ho Ah Kow v. Nunan, 12 F.Cas. 252 (No. 6,546) (C.C. D.Cal.1879).[14] Finally, plaintiff does not claim that he was deprived of equal protection of the laws by the enforcement of a rule which arbitrarily discriminated between members of different races or between males and females. Cf., Crews v. Cloncs, 432 F.2d 1259, 1266 (7th Cir. 1970).

Plaintiff's claim is that his "mode of dress and appearance," *simpliciter,* are protected by the Constitution, and that his dismissal was therefore impermissible.

We, of course, have no precise understanding of how plaintiff actually dresses or appears. As he notes in his brief, he may, on the one hand, wear well-pressed three-piece blue suits and have sideburns at the middle of his ears and a neatly clipped Vandyke beard; or alternatively, he may wear t-shirts and faded levies and have an unkempt beard and sideburns which substantially cover his entire face.[15] He seems to assume that these two alternatives would raise different constitutional claims. We disagree.

We think we must assume that plaintiff's appearance is such that he in good faith believes that it is appropriate for classroom purposes, but that the members of the school board nevertheless considered it unacceptable. We must also assume that if we were to resolve the difference of opinion between the plaintiff and the school board, we would conclude with plaintiff that his appearance and style of dress are neither offensive nor objectionable. The question we must decide is whether this is the sort of determination that federal judges have the power and duty to make.

## II.

The constitutional issue has two aspects: first, whether an individual's interest in appearing as he pleases is an

---

12. In that case the Court carefully pointed out that the issue involved "direct primary First Amendment rights akin to 'pure speech,'" and expressly noted that the problem did not relate to regulation of such matters as "the type of clothing, to hair style, or to deportment." See 393 U.S. at 507–508, 89 S.Ct. at 737.

13. Cf., Lipp v. Board of Education of City of Chicago, 470 F.2d 802, 805–806 (7th Cir. 1972): "Plaintiff's appellate brief also raises the issue that the rating he received was given in retaliation for the exercise of his

First Amendment rights. However, his complaint alleged no facts to sustain this theory, and the allegations added on appeal cannot make up for the deficiencies in the complaint."

14. Compare New Rider v. Board of Education of Independent School District No. 1, Pawnee County, Oklahoma, 480 F.2d 693 (10th Cir. 1973), cert. denied, 414 U.S. 1097, 94 S.Ct. 733, 38 L.Ed.2d 556 (Douglas, J., dissenting).

15. See n. 11, *supra.*

interest in "liberty" within the meaning of the Due Process Clause of the Fourteenth Amendment,[16] and second, assuming that it is, whether a refusal or discontinuance of public employment motivated by disapproval of an individual's appearance, is a deprivation of that interest. We evaluate these two aspects separately, but our ultimate judgment rests upon an appraisal of both.

### A.

Unquestionably, individual choice in matters of hair style, dress, and overall appearance can reasonably be characterized as an aspect of freedom or "liberty." Sometimes the choice reflects a religious conviction, the expression of a political faith, a national or family heritage, or simply a personal interest in projecting a special image or character. The word "liberty" is not demeaned by construing it to include a right to appear as one pleases.

Prior to the Supreme Court's decision in Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46, decisions of this court and others had assumed that the "right to wear one's hair at any length or in any desired manner is an ingredient of personal freedom protected by the United States Constitution."[17] It is difficult, and perhaps impossible, to reconcile that assumption with the underlying rationale of the Court's holding in *Ham*.

In that case the State trial judge had refused to interrogate prospective jurors about their possible prejudice against the defendant because of his race or because he wore a beard. On the record before it, the Supreme Court therefore assumed, for the purpose of its decision, that some members of the jury might have harbored a prejudice against blacks or a prejudice against people with beards. The former assumption invalidated the defendant's conviction; for he had a federal constitutional right not to have the State—acting through its jurors—treat him less favorably than others simply because of his race. On the other hand, such differential treatment because he wore a beard was constitutionally indistinguishable "from a host of other possible similar prejudices."[18] Implicitly *Ham* must hold either that there is no constitutional right to appear as one pleases, or at least, that a person has not been deprived of liberty simply because a State permits his appearance to prejudice his defense to criminal charges. It would, of course, be unwise to read too much into the *Ham* opinion, since the discussion of the second issue was not necessary to the decision. This

---

16. " . . . [N]or shall any State deprive any person of life, liberty, or property, without due process of law;" see *Roth, supra*, 408 U.S. at 572–575.

17. Breen v. Kahl, 419 F.2d 1034, 1036 (7th Cir. 1969) ; Crews v. Cloncs, 432 F.2d 1259, *supra;* Arnold v. Carpenter, 459 F.2d 939, 941–942 (7th Cir. 1972) ; see also cases cited in n. 5 to the majority opinion in *Arnold*, 459 F.2d at 941.

18. The relevant paragraph of the majority opinion in Ham reads as following:

"The third of petitioner's proposed questions was addressed to the fact that he wore a beard. While we cannot say that prejudice against people with beards might not have been harbored by one or more of the potential jurors in this case, this is the beginning and not the end of the inquiry as to whether the Fourteenth Amendment required the trial judge to interrogate the prospective jurors about such possible prejudice. Given the traditionally broad discretion accorded to the trial judge in conducting *voir dire*, Aldridge v. United States [283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054], and our inability to constitutionally distinguish possible prejudice against beards from a host of other possible similar prejudices, we do not believe the petitioner's constitutional rights were violated when the trial judge refused to put this question. The inquiry as to racial prejudice derives its constitutional stature from the firmly established precedent of *Aldridge* and the numerous state cases upon which it relied, and from a principal purpose as well as from the language of those who adopted the Fourteenth Amendment. The trial judge's refusal to inquire as to particular bias against beards, after his inquiries as to bias in general, does not reach the level of a constitutional violation." 409 U.S. at 527–528, 93 S.Ct. at 851.

much, however, seems quite clear: if one's interest in appearing as he chooses is a constitutionally protected interest in liberty, it is of a much lesser magnitude than a "fixed star in our constitutional constellation." [19]

## B.

■ Even if we assume for purposes of decision that an individual's interest in selecting his own style of dress or appearance is an interest in liberty, it is nevertheless perfectly clear that every restriction on that interest is not an unconstitutional deprivation.

From the earliest days of organized society, no absolute right to an unfettered choice of appearance has ever been recognized; matters of appearance and dress have always been subjected to control and regulation, sometimes by custom and social pressure, sometimes by legal rules. A variety of reasons justify limitations on this interest. They include a concern for public health [20] or safety,[21] a desire to avoid specific forms of antisocial conduct,[22] and an interest

in protecting the beholder from unsightly displays.[23] Nothing more than a desire to encourage respect for tradition, or for those who are moved by traditional ceremonies, may be sufficient in some situations.[24] Indeed, even an interest in teaching respect for (though not necessarily agreement with) traditional manners, may lend support to some public grooming requirements. Therefore, just as the individual has an interest in a choice among different styles of appearance and behavior, and a democratic society has an interest in fostering diverse choices, so also does society have a legitimate interest in placing limits on the exercise of that choice.

Although we must assume that some impairment of the individual interest in appearing as one pleases is plainly appropriate, we may also assume that some restrictions would be so extreme that they would readily be condemned as unconstitutional deprivations. In this case, however, we are not confronted with the question whether a specific form of dress or exposure may be

19. Compare Justice Jackson's revelatory metaphor in Board of Education v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628, with the uncertain placement of the appearance interest in a vaguely described "penumbra" in Breen v. Kahl, *supra*, 419 F.2d at 1036. In their separate opinions in *Ham*, dissenting on this point, Justice Douglas and Justice Marshall described the action of the trial judge as an abuse of discretion of sufficient seriousness to warrant reversal. It is of interest to note, however, that their analyses rested on the *magnitude* of the jurors' possible prejudice against beards—which might, of course, have denied the defendant his right to an impartial jury—rather than on the *quality* of a prejudice against beards as in any sense comparable to a constitutionally impermissible prejudice against blacks. Because of the constitutional difference between racial prejudice on the one hand, and a prejudice against beards on the other hand, the Federal Constitution foreclosed the trial judge's discretion in the first category in a fundamentally different way than in the second.

20. In restaurant kitchens, for example, the law may require the chef to cover his hair. See Mun.Code of Chicago, § 130–5.

21. See, for example, Ind.Code, § 22–10–11–8, requiring protective head-gear for miners. See also Ind.Code § 9–8–9–3 requiring motorcyclists to wear protective helmets.

22. See, for example, the Illinois prohibition against indecent exposure, 38 Ill.Rev.Stat., § 11–9, which presumably is intended to arrest other antisocial behavior described therein at its incipiency.

23. Just as the offensive character of some forms of sound may justify restriction on the freedom to communicate orally, see Kovaks v. Cooper, 336 U.S. 77, 87, 69 S.Ct. 448, 93 L.Ed. 513 (Opinion of Reed, J.), so may the offensive character of some forms of appearance justify restricting an individual's interest in appearing as he pleases.

24. At a memorial service for an unknown soldier, or perhaps the inauguration of a Governor, for example, the individual interest in an unfettered choice of appearance would certainly not, in itself, be sufficient to invalidate every attempt to exclude visitors attired inappropriately.

required[25] or totally prohibited.[26] Nor do we have a case such as Ham v. South Carolina, *supra,* in which a State's determination of an individual's guilt or innocence may be affected by the jury's unfavorable reaction to his appearance. If we assume that this case does involve a deprivation of liberty, the deprivation is one which formerly would have been denigrated as nothing more than the waiver of a privilege rather than the impairment of a right.[27]

The impairment of the individual's interest in selecting his own life style which results from the employment decision of one local school board is much less significant than the deprivations of liberty which have been condemned in other cases.[28] The unavailability of a teaching position in one School District is less serious, for example, than the deprivation of an opportunity to obtain an education, *cf.,* Crews v. Cloncs, *supra,* or the complete exclusion from a profession, *cf.* Schware v. Board of Bar Examiners of New Mexico, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796, or from any public employment in the state, *cf.,* Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216, or even from such employment while one political party is in power, *cf.* Illinois State Employees Union v. Lewis, *supra.* If the facts are as plaintiff has alleged, he is a competent teacher and the board's disapproval of his appearance is wholly irrational. On that hypothesis, it is not unreasonable to assume that the availability of other teaching opportunities will make it unnecessary for him to make any basic change in his chosen appearance.[29]

. In sum, the constitutional interest which plaintiff seeks to vindicate is not of the first magnitude and the impair-

25. We do not have a case in which the sovereign insists that every citizen must wear a brown shirt to demonstrate his patriotism. Fortunately, intervention of the federal judiciary has not been required during the brief history of our Republic in order to avoid intolerable instances of required conformity like that following the Manchus' invasion of China in 1644, or the official prohibition of beards during the reign of Peter the Great. See Crews v. Cloncs, *supra,* 432 F.2d at 1264, n. 7.

26. Consider Judge Cooley's comment on Justice Field's opinion in *Ho Ah Kow, supra,* in which he stated in part:

"There is and can be no authority in the state to punish as criminal such practices or fashions as are indifferent in themselves, and the observance of which does not prejudice the community or interfere with the proper liberty of any of its members. No better illustration of one's rightful liberty in this regard can be given than the fashion of wearing the hair. If the wearing of a queue can be made unlawful, so may be the wearing of curls by a lady or of a mustache by a beau, and the state may, at its discretion, fix a standard of hair-dressing to which all shall conform. The conclusive answer to any such legislation is, that it meddles with what is no concern of the state, and therefore invades private right." 18 Am. Law Reg. 685, also quoted in the margin of 12 Fed.Cas. at 254.

27. The so-called abandonment of the right-privilege distinction represents a change in appraisal of the significance—not of the essential accuracy—of Mr. Justice Holmes' observation that a man "may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." McAuliffe v. City of New Bedford, 155 Mass. 216, 29 N.E. 517 (1892). Because of the admitted importance of a First Amendment right, its impairment by interference with the exercise of a privilege may represent a deprivation of the right. But it by no means follows that every limitation on a privilege which has been influenced by the exercise of a constitutional right is necessarily a deprivation of that right.

28. In one sense the issue is whether it is more unreasonable for the school board to require a teacher to shave off his beard, or perhaps trim it, than it is for the teacher to sacrifice his job rather than his beard. We recognize, of course, that a requirement that a teacher shave off his beard is a more significant impairment of his interest in appearing as he pleases than a requirement that he wear a tie or a coat during school hours because it has a greater impact on his private, after-school, life. Nevertheless, the same interest is at stake in both situations, and the difference in the amount of its "deprivation" is, we believe, one of degree rather than kind.

29. It is appropriate to observe that those who choose not to conform to tradition in matters of appearance must anticipate, as a consequence, that a number of other people may elect not to associate with them. Since the acceptance of employment, whether pri-

ment of that interest is a relatively minor deprivation at best.[30] The question we must decide, however, is whether plaintiff's allegations have nevertheless raised a constitutional issue which should only be decided after an evidentiary hearing.

## C.

We assume that this case arises out of an honest disagreement between a teacher and the members of a locally elected school board as to what mode of dress and appearance is appropriate for a junior high school classroom. Were we members of the school board, we have no hesitation in saying that we would regard dress and hair style as matters of relatively trivial importance on any scale of values used in appraising the qualifications of a teacher.[31] But the question is not how we would act as members of a school board. The question for us to decide is whether the Federal Constitution commands us, as federal judges, to review a decision which board members have allegedly made on the basis of the plaintiff's appearance.

If this is a task the Constitution requires us to perform, two alternative procedures are feasible. We might hold that the mere allegation that plaintiff's appearance was a factor in the defendant's decision is sufficient to require an evidentiary hearing.[32] Alternatively, we may hold that unless plaintiff alleges an additional factor, such as a purpose to discriminate against a racial or political group, or perhaps a religious justification for his form of dress, we will not review a school board decision that involves nothing more than a difference of opinion on a question of style.

The first approach would lead the federal judiciary into unprecedented participation in local affairs. For if plaintiff's theory is valid, it cuts across the entire spectrum of public employment. Any personnel decision which is arguably affected by an unfavorable reaction to the appearance of an employee, or of a job applicant, would be a potential source of constitutional litigation. If the considerations of procedural fairness involved in Board of Regents v. Roth, *supra*, were insufficient to persuade the Supreme Court that federal judicial review of a school board decision was warranted, the interests at stake in this case can hardly justify such a result.

---

vate or public, always entails some need to comply with an employer's concept of the manners which are suitable to the position, including matters of speech and behavior as well as appearance and grooming, the deliberate nonconformist inevitably prejudices his own employment prospects. The "deprivation" involved here merely requires the public employee to pay the same price for nonconformity as must the private employee. Stated somewhat differently, the deprivation is a refusal to give the non-conforming public employee a preferred status as compared with his counterpart in the private sector. Plaintiff's position in this case is therefore not supported by the holding in *Lewis, supra*, which protects public employees from a discharge practice not ordinarily present in the private sector. See Illinois State Employees Union v. Lewis, *supra*, 473 F.2d at 575.

30. Even if other employment is unavailable, it is not inconceivable that moderate tonsorial changes might be sufficient to satisfy a majority of the members of a school board. After all, a holding that a federal judicial remedy is unavailable will not mean that a

teacher's appearance interest is entirely unprotected. Since school board members are accountable to the community from which they are selected, presumably their resolution of questions of style will at least be supported by local tradition.

31. "In contrast with morals, the rules of deportment, manners, dress, and some, though not all, rules of law, occupy a relatively low place in the scale of serious importance. They may be tiresome to follow, but they do not demand great sacrifice: no great pressure is exerted to obtain conformity and no great alterations in other areas of social life would follow if they were not observed or changed." H.L.A. Hart, The Concept of Law, 169 (1961).

32. At such a hearing if the teacher could prove that his dismissal was, in whole or in part, the consequence of his appearance, presumably the burden of explanation or justification would rest upon the defendants. We do not understand plaintiff to contend that he would be entitled to judgment simply on the basis of proof that his appearance caused his discharge. See note 11, *supra*.

■ When the State selects the personnel through whom it deals with the public, it undoubtedly may consider an individual's appearance as one of the factors affecting his suitability for a particular position. Logically, one might argue that no significance should be attached to the image projected by the appearance of a public official—a pilot should be able to land an airplane as well in dirty overalls as in a neat uniform, and a teacher should be able to explain the pythagorean theorem as well in a t-shirt as in a three-piece suit—but the public's reaction to an official, and a student's reaction to his teacher, is undoubtedly affected by the image he projects.

■ If a school board should correctly conclude that a teacher's style of dress or plumage, has an adverse impact on the educational process, and if that conclusion conflicts with the teacher's interest in selecting his own life style, we have no doubt that the interest of the teacher is subordinate to the public interest. We must assume, however, that sometimes such a school board determination will be incorrect. Even on that assumption, we are persuaded that the importance of allowing school boards sufficient latitude to discharge their responsibilities effectively—and inevitably, therefore, to make mistakes from time to time—outweighs the individual interest at stake.[33] We do not imply that diversity and individualism among members of the teaching profession is less desirable than conformity; the critical point is that each choice between conformity and diversity is itself affected by a variety of factors, and local school boards need the freedom to make diverse choices for themselves.

If such choices must be tested against a federal constitutional standard, perhaps Vandyke beards and three button suits—or possibly shaven heads and t-shirts—will be permissible for all teachers throughout the nation. In the name of maximizing the individual teacher's freedom to appear as he pleases, such a constitutional rule would minimize the areas of choice available to local school boards in determining the impact of teacher appearance on the educational process, and on the associational interests of the children for whose education they are responsible.

■ Although the interest of children in associating with persons of their choice is, of course, severely limited by both their parents and the State, we should not ignore the fact that they do have a valid interest in not being compelled to associate with persons they or their parents consider objectionable. In the classroom, since their presence is compelled, they necessarily must look to the school board for protection of this interest. For this reason, it is appropriate for the school board, elected by the local community, to select the people with whom it wants the minors of the community to associate as teachers. We do not necessarily approve the decision this school board, or any school board, might make; as in the case of the con-

---

33. Justice Brandeis' comment on the importance of permitting State experimentation with untested policy is equally applicable to social and economic matters:

"To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country. This Court has the power to prevent an experiment. We may strike down the statute which embodies it on the ground that, in our opinion, the measure is arbitrary, capricious or unreasonable. We have power to do this, because the due process clause has been held by the Court applicable to matters of substantive law as well as to matters of procedure. But in the exercise of this high power, we must be ever on our guard, lest we erect our prejudices into legal principles. If we would guide by the light of reason, we must let our minds be bold." New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 387, 76 L.Ed. 747 (dissenting opinion) (footnote omitted).

tent of the speech in Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L. Ed.2d 430, we merely hold that as long as no greater interest than that involved in this controversy is at stake, the decision is one that the school board is entitled to make.

In deciding whether the Federal Constitution commands us to review school board action allegedly predicated on plaintiff's appearance, we must necessarily identify the source of the standards by which to test such school board decisions.[34] If we accept the premise that the board may consider appearance and mode of dress as a factor affecting the employment decision—indeed, plaintiff seems to agree that this factor is permissible provided that it is appraised in a reasonable way—we would then be forced to decide when a grooming requirement exceeded constitutional limits and when it did not. The concept of "rationality" would be our only guideline;[35] that concept, so often criticized in discussions of substantive due process, is, we believe, too indefinite to justify the substitution of our judgment for that of a local board on a question of manners.

We therefore hold that even if the individual interest in one's appearance may be characterized as an interest in liberty, the denial of public employment because the employer considers the applicant's appearance inappropriate for the position in question, does not in and

of itself represent a deprivation that is forbidden by the Due Process Clause.

The judgment is

Affirmed.

34. Since we could not automatically rule in favor of a teacher whenever he or she had a dispute with the school board over personal appearance appropriate for a classroom, there must be principled standards upon which we might either sustain or overrule the judgment of the school board. Cf., Paris Adult Theatre I v. Slaton, 413 U.S. 49, 73, 93 S.Ct. 2628, 37 L.Ed.2d 446 (Brennan, J., dissenting).

35. It is one thing for us to make judgments upon the ground of rationality in spheres of our own special competence, e. g., whether certain evidence is relevant to a question being litigated, or whether a certain criminal

procedure adequately protects the rights of defendants; it is quite another for us to volunteer to assess social problems generally. Cf., Mr. Justice Black, sitting as Circuit Justice in Karr v. Schmidt, 401 U.S. 1201, 1203, 91 S.Ct. 592, 593, 27 L.Ed.2d 797. "There can, of course, be honest differences of opinion as to whether any government, state or federal, should as a matter of public policy regulate the length of haircuts, but it would be difficult to prove by reason, logic, or common sense that the federal judiciary is more competent to deal with hair length than are the local school authorities and state legislatures of all our 50 states."