EAST HARTFORD EDUCATION ASSO-CIATION et al., Appellants,

v.

BOARD OF EDUCATION OF the TOWN OF EAST HARTFORD et al., Appellees.

No. 118, Docket 76–7005.

United States Court of Appeals, Second Circuit.

Argued Sept. 15, 1976.

Decided Feb. 22, 1977.

On Rehearing En Banc Aug. 19, 1977.

Martin A. Gould, Hartford, Conn. (Gould, Killian & Krechevsky, Hartford, Conn., of counsel), for appellants.

Brian Clemow, Hartford, Conn. (Coleman H. Casey, Shipman & Goodwin, Hartford, Conn., of counsel), for appellees.

Before SMITH, OAKES and MESKILL, Circuit Judges.

OAKES, Circuit Judge:

Appellants unsuccessfully sought below a declaratory judgment of the unconstitutionality of, and injunction against the enforcement of, the East Hartford public school teachers' dress code. Suit was brought under 42 U.S.C. §§ 1983 and 1988, and jurisdiction was invoked under 28 U.S.C. §§ 1331, 1343, 2201, and 2202. The appellant teacher, Richard P. Brimley (hereinafter "appellant"), was joined as a plaintiff below, and is joined as an appellant here, by his local and state teachers' unions. Appellant exhausted his administrative remedies by seeking to use his union's grievance procedures, his grievance going to arbitration before Professor Archibald Cox; the grievance was dismissed as not arbitrable because its subject was not covered by the collective bargaining agreement. *East Hartford Education Association v. East Hartford Board of Education*, Amer. Arb. Ass'n No. 12–39–0184–72 (Jan. 25, 1973). Chief Judge Clarie granted summary judgment to the appellees and dismissed the complaint below, 405 F.Supp. 94 (D.Conn. 1975), finding no violation of any Fourteenth Amendment or First Amendment rights and a legitimate governmental interest. We reverse and remand for hearing on the merits.

## I. FACTS

Appellant Brimley teaches English and film-making in an East Hartford public high school. He objects to so much of the Board's dress code, set out in the margin,[1]

---

1. The attire of professional employees during the hours when school is in session must be judged in light of the following:

1. Dress should reflect the professional position of the employee.

as requires him to wear a shirt and tie with his sport jacket; he seeks to wear a turtleneck sweater or opennecked sport shirt with his jacket. In the present posture of the case, there is involved no claim whatsoever that appellant's desired dress would cause any disruption of the classroom, any problem of pupil discipline, any challenge to school board curricular authority, or any other interference with school operations. Nor is there any suggestion that appellant has at any time been otherwise than moral, neat and clean in person and in dress, or that he has in any way defied the orders of the school board. He has at all times complied with the dress code, albeit under protest, and he has made his challenge through the proper legal channels. *Cf. Doran v. Salem Inn, Inc.*, 422 U.S. 922, 929, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (distinguishing, for equitable abstention purposes, between challengers to local ordinance who obeyed it while injunctive action pending and one who violated it).

As Professor Cox, the arbitrator, found, and as we must assume, appellant feels "very deeply and very strongly that his personal integrity is invaded and his effectiveness as a teacher diminished by the dress regulation." Appellant in his brief alleges, and we must accept at this summary judgment stage, that he wishes to present himself to his students as a person "not tied to 'establishment conformity' "

2. Attire should be that which is commonly accepted in the community.
3. It should be exemplary of the students with whom the professional employee works.
4. Clothing should be appropriate to the assignment of the employee, such as slacks, and jersey for gym teachers.
   In most circumstances the application of the above criteria to classroom teachers would call for jacket, shirt and tie for men and dress, skirts, blouse and pantsuits for women.
   If an individual teacher feels that informal clothing such as sportswear, would be appropriate to his or her teaching assignment, or would enable him or her to carry out assigned duties more effectively, such requests may be brought to the attention of the Principal or Superintendent. An attempt should be made on all levels to insure that the above principles are applied equitably and consistently throughout the school system.

but rather as one associated with the ideas and social outlook of the student generation. He feels that his dress "enables him to achieve a closer rapport with his students and thus enhances his ability to teach." The Board's own interpretation of its dress code, as set forth in its answers to interrogatories, is that the code presumes that a jacket, shirt and tie is the appropriate attire for male teachers in "ordinary classroom situations" (which do not in the Board's view include physical education, industrial arts, science laboratories and field trips); the presumption may be rebutted in individual cases if a teacher can establish that "more informal attire would be more appropriate to the subject matter and/or method of instruction involved (e. g. small group instruction involving drug education or sex education where the method of instruction is a 'rap session')." Appellant apparently made a sufficient showing that informal attire was appropriate for his film-making classes, but failed to win approval to wear such attire in his English classes.

## II. THE INDIVIDUAL INTERESTS AT STAKE

### A. *The Liberty Interest In One's Personal Appearance*

*Kelley v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976), is the principal Supreme Court case [2] bearing on the ques-

2. In *Quinn v. Muscare*, 425 U.S. 560, 96 S.Ct. 1752, 48 L.Ed.2d 165 (1976), the Court dismissed as improvidently granted a writ of certiorari in a challenge to a fire department hair regulation. The cases in the lower courts are collected in Note, *On Privacy: Constitutional Protection for Personal Liberty*, 48 N.Y.U.L. Rev. 670, 760–70 (1973). Over 100 hair-length opinions had been written by state and federal courts by October, 1973. *Id.* at 760 n.584. *See also* 1 N. Dorsen, P. Bender & B. Neuborne, *Political and Civil Rights in the United States*, 846–48, 1015–16 (4th ed. 1976). An interesting analysis of the constitutional theory underlying these and related cases is Fourth Circuit Judge Craven's *Personhood: The Right to be Let Alone*, 1976 Duke L.J. 699. Judge Craven acknowledges his indebtedness to Professor Freud for the term "personhood" as an alternative to "privacy" or "autonomy." *Id.* at 702 & n.15.

tions whether and to what extent a person has a constitutionally cognizable liberty interest in his or her personal appearance. *Kelley* did not decide these questions, although it did indicate that whatever the interest is, it is somewhat less weighty than the interests implicated in cases involving "procreation, marriage, and family life." *Id.* at 244, 96 S.Ct. 1440. In upholding a hair code for policemen, the Supreme Court emphasized the employment status of the police officer and the unquestioned "need for discipline, esprit de corps, and uniformity" in a police force. *Id.* at 246, 96 S.Ct. at 1446. *See also Stradley v. Andersen*, 478 F.2d 188, 190–91 (8th Cir. 1973); *Yarbrough v. City of Jacksonville*, 363 F.Supp. 1176, 1179 (M.D.Fla.1973); Note, *On Privacy: Constitutional Protection for Personal Liberty*, 48 N.Y.U.L.Rev. 670, 768–69 (1973). We commence with the premise that quite different considerations apply here. Even though both teachers and policemen are employees of the state through local governmental units, terms like "discipline" and "esprit de corps," appropriate for members of a uniformed paramilitary force, are manifestly inappropriate for high school teachers. *Compare Kelley v. Johnson, supra*, 425 U.S. at 245–46, 96 S.Ct. 1440 (policemen must salute flag), *with Russo v. Central School District No. 1*, 469 F.2d 623 (2d Cir. 1972), *cert. denied*, 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973) (public high school teacher need not salute flag). Mr. Justice Powell's concurring opinion in *Kelley* reinforces the view we share that "no negative implication" as to the more general liberty interest in personal appearance is to be drawn from the *Kelley* majority opinion. *Id.* at 249, 96 S.Ct. 1440. On this assumption, we examine the liberty interest asserted by appellant.

The right to control one's own body, recognized by Supreme Court decree as constitutionally derived, *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), extends in the minds and hearts of many individuals to the body's teguments, be they clothing or hair. People have been conscious of personal appearance and fashion from the time the first of our forebears crawled out of what Judge Learned Hand so onomatopoetically referred to as the "primordial ooze." Samson, for one, was thought to be deprived of his strength when shorn of his hair by Delilah. Our Roman, Grecian, and European antecedents made much of their styles of dress and hair. *See* Op. Vt. Att'y Gen. No. 23 (1967), *reprinted in* [1966–1968] Vt. Att'y Gen. Biennial Rep. 199–200.

Substantial creative efforts of mankind have been devoted to matters of dress, from the robes of the ancient Egyptians to King Henry VIII's armor, and dress has often conveyed a message, whether it be one of martyrdom in the sackcloth and ashes of the early Christians, respect for God in the skullcaps worn by many Jews, or achievement and calling in the regalia worn in academic processions. The mark of authority for priest and judge alike has been a robe, for monks baldness has been a sign of asceticism, and for English judges and our own founding fathers powdered wigs were a symbol of wisdom, authority, and sometimes affluence.

Conversely, recognizing the role clothing plays in giving individuals a sense of freedom and identity, the military, prisons, and other authoritarian institutions have long used strict uniformity of dress and hair style to effectuate conformity. Their purpose has been to deprive a person of his individuality in the interests of better discipline and related aims. T. E. Lawrence described the effectiveness of such measures:

[I]t came upon me freshly how the secret of uniform was to make a crowd solid, dignified, impersonal: to give it the singleness and tautness of an upstanding man. This death's livery which walled its bearers from ordinary life, was a sign that they had sold their wills and bodies to the State: and contracted themselves

into a service not the less abject for that its beginning was voluntary.

*Revolt in the Desert* 317 (1927).

History is replete with instances of oppression accomplished by body-tegument conformity. Following the Manchus' invasion of China in 1644, for example, the conquerors sought to consolidate their power by requiring the population to wear a prescribed hair style and prescribed clothing; thousands chose to die rather than accept these marks of servitude. *See Crews v. Cloncs*, 432 F.2d 1259, 1264 n.7 (7th Cir. 1970), *citing* H. McAleavy, *History of Modern China* 23 (1967). Peter the Great attempted to force upon his country a more Western lifestyle by the autocratic imposition of a heavy tax on the beards that were universally worn by 17th century Russian men. The beards had religious significance in the Russian Orthodox Church, however, and hence were saved even after being shaved off in order to ensure their owners' entry into heaven. *See* J. Robinson, *Readings in European History* 390 (1906). Today, dictatorships of both the left and the right use hair and dress regulation as part of their programs of behavior regulation. In short, as Judge Wisdom has eloquently reminded us, a person deprived of the freedom to dress as he pleases

> is forced against his will to hold himself out symbolically as a person holding ideas contrary, perhaps, to ideas he holds most dear. Forced dress . . . humiliates the unwilling complier, forces him to submerge his individuality in the "undistracting" mass, and in general, smacks of the exaltation of organization over member, unit over component, and state over individual. I always thought this country does not condone such repression.

*Karr v. Schmidt*, 460 F.2d 609, 621 (5th Cir.) (en banc, 8–7) (dissenting opinion), *cert. denied*, 409 U.S. 989, 93 S.Ct. 307, 34 L.Ed.2d 256 (1972). *See also* J. S. Mill, *On Liberty* (1859).

In view of these historical and contemporary factors, it would be difficult not to conclude that "a liberty interest within the Fourteenth Amendment," *Kelley v. Johnson, supra*, 425 U.S. at 249, 96 S.Ct. at 1447 (Powell, J., concurring), is involved in this case. In a passage cited recently by Mr. Justice Powell, *id.*, Mr. Justice Harlan wrote that, in assessing claims of infringement of liberty, we judges must "hav[e] regard to what history teaches are the traditions from which [this country] developed as well as the traditions from which it broke," and he added, "[t]hat tradition [*sic* ] is a living thing." *Poe v. Ullman*, 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (dissenting opinion). Along the "rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints," *id.* at 543, 81 S.Ct. at 1777, the liberty interest asserted by appellant here is a weighty one deserving our careful attention.

## B. *Teaching and the First Amendment*

In addition to the general liberty interest in one's appearance, in the teaching context there is a strong additional interest that must be weighed in the scales in determining the constitutionality of regulatory intrusions like the one at issue here. The claim appellant makes is not simply a symbolic speech claim. Rather, it is a claim that the inseparable complex of speech, conduct and character known as teaching is a First Amendment interest that in and of itself should be protected from needless regulation by the State.

The academic context has long been given special constitutional protection in our country, because the educational needs of a free people are of utmost importance. *See, e. g., Epperson v. Arkansas*, 393 U.S. 97, 104–05, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *Meyer v. Nebraska*, 262 U.S. 390, 400–03, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). As Jefferson so clearly recognized,[3] an educated and

---

**3.** I think by far the most important bill in our whole code is that for the diffusion of knowledge among the people. No other sure foundation can be devised for the preservation of freedom, and happiness. . . . Preach, my dear Sir, a crusade against ignorance;

enlightened citizenry is a prerequisite to the functioning of any representative democracy. *See also San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 30, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *id.* at 111–15, 93 S.Ct. 1278 (Marshall, J., dissenting); *Wisconsin v. Yoder*, 406 U.S. 205, 221, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). We are dealing here, in short, with the assertion of a First Amendment right by one in a special profession "essential . . . to the public welfare," *Meyer v. Nebraska, supra*, 262 U.S. at 400, 43 S.Ct. 625, whose freedom to teach is entitled to be protected accordingly. *See generally Russo v. Central School District No. 1, supra*, 469 F.2d at 631–34.

Freedom to teach in the manner of one's choice is a form of academic freedom that is universally recognized, if not invariably protected, at the college level, *see, e. g., Sweezy v. New Hampshire*, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); T. Emerson, *The System of Freedom of Expression* 593–626 (1970); *Developments in the Law—Academic Freedom*, 81 Harv.L.Rev. 1045 (1968), and that has been accorded significant respect in cases involving public secondary school teachers, *see Epperson v. Arkansas, supra; Birdwell v. Hazelwood School District*, 491 F.2d 490, 493 (8th Cir. 1974), *aff'g* 352 F.Supp. 613 (E.D.Mo.1972); *Mailloux v. Kiley*, 448 F.2d 1242 (1st Cir.), *aff'g* 323 F.Supp. 1387 (D.Mass.1971); *Keefe v. Geanakos*, 418 F.2d 359 (1st Cir. 1969); *Sterzing v. Fort Bend Independent School District*, 376 F.Supp. 657, 661–62 (S.D.Tex.1973), *vacated on other grounds*, 496 F.2d 92 (5th Cir. 1974); *Moore v. Gaston County Board of Education*, 357 F.Supp. 1037 (W.D.N.C.1973); *Webb v. Lake Mills Community School District*, 344 F.Supp. 791 (N.D.Iowa 1972); *Downs v. Conway School District*, 328 F.Supp. 338 (E.D.Ark.1971); *Parducci v. Rutland*, 316 F.Supp. 352 (M.D. Ala.1970); *Lindros v. Governing Board of*

*Torrance Unified School District*, 9 Cal.3d 524, 108 Cal.Rptr. 185, 510 P.2d 361, *cert. denied*, 414 U.S. 1112, 94 S.Ct. 842, 38 L.Ed.2d 739 (1973); Nahmod, *Controversy in the Classroom: The High School Teacher and Freedom of Expression*, 39 Geo.Wash.L. Rev. 1032 (1971); Van Alstyne, *Constitutional Rights of Teachers and Professors*, 1970 Duke L.J. 841; Project, *Education and the Law: State Interests and Individual Rights*, 74 Mich.L.Rev. 1373 (1976); Note, *Academic Freedom in the Public Schools: The Right to Teach*, 48 N.Y.U.L.Rev. 1176 (1973). In secondary schools, it is true, the idea of academic freedom may be balanced to a degree by the countervailing interest of states, acting through local school boards, to inculcate basic community values in students who may not be mature enough to deal with academic freedom as understood or practiced at higher educational levels. *See Mailloux v. Kiley, supra*, 323 F.Supp. at 1392; Goldstein, *The Asserted Constitutional Right of Public School Teachers to Determine What They Teach*, 124 U.Pa.L.Rev. 1293, 1342–44 (1976). *See also Presidents Council, District 25 v. Community School Board No. 25*, 457 F.2d 289 (2d Cir.), *cert. denied*, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972). This may mean that public secondary school boards have considerable discretion as to the substantive content of what is taught, but there is no reason to extend this wide discretion to the teaching process itself. There is, as we see it, a sharp distinction between content of curriculum and pedagogical methodology. *see Minarcini v. Strongsville City School District*, 384 F.Supp. 698, 707 (M.D.Ohio 1974); *Beebee v. Haslett Public Schools*, 66 Mich.App. 718, 727, 239 N.W.2d 724, 729 (1976); *Goldstein, supra*, 124 U.Pa.L.Rev. at 1337–39. As long as the substantive values that the school board seeks to inculcate are not subverted by the way in which a teacher wishes to communicate with his students,

establish and improve the law for educating the common people. Let our countrymen know that the people alone can protect us against these evils, and that the tax which will be paid for this purpose is not more than the thousandth part of what will be paid to kings, priests and nobles who will rise up among us if we leave the people in ignorance. Letter from Thomas Jefferson to George Wythe, Aug. 13, 1786, *quoted in The Portable Thomas Jefferson* 399–400 (M. Peterson ed. 1975).

compare *Sterzing v. Fort Bend Independent School District, supra,* with *Knarr v. Board of School Trustees,* 452 F.2d 649, 650 (7th Cir. 1971), the teacher's freedom to choose teaching methods is entitled to be weighed in the constitutional scales.

This irreducible core of academic freedom extends, in our view, to the particular style of clothing that appellant wishes to wear here.[4] As noted, he is subverting no community values; neatness, cleanliness and morality are not involved. Moreover, appellant is concededly sincere in his belief, which is certainly reasonable, that a slightly more informal mode of dress will make him a more effective teacher.[4A] It is a truism that, long after a student's substantive knowledge has been forgotten, it is the character of a good teacher—of which appearance and style are inevitably part—that is most remembered and that continues to inspire. *Cf. Dunau as Teacher: A Student View,* 88 Harv.L.Rev. 1359 (1975) (student memorial tribute to Professor Bernard Dunau); *In Memory of Alexander M. Bickel,* 84 Yale L.J. 198 (1974) (student tribute to Professor Bickel). Appellant's attempt to express himself on this level is, we hold, an interest entitled to First Amendment protection.

## III. THE STATE'S COUNTERVAILING INTERESTS

The reasons advanced by appellees for their tie code are that it establishes "a professional image for teachers," that it promotes "good grooming among students," and that it aids maintenance of "respect" and "decorum" in the classroom.[5] While other reasons for teacher dress codes might be generated by a fertile imagination, un-der recent Supreme Court authority we are required to limit our attention to legitimate, articulated, non-illusory state objectives. *See Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 314 & n.6, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam); *Johnson v. Robison,* 415 U.S. 361, 376, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *San Antonio Independent School District v. Rodriguez, supra,* 411 U.S. at 17, 93 S.Ct. 1278; *McGinnis v. Royster,* 410 U.S. 263, 276, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973). *See also* Gunther, *The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1 (1972).

The first of the Board's stated interests, establishing a Professional image for teachers, is outside the scope of the authority delegated to school boards by the State and hence cannot be used to uphold the disputed regulation. *See San Antonio Independent School District v. Rodriguez, supra,* 411 U.S. at 17, 93 S.Ct. 1278 (state purpose must be "legitimate"). The relevant statute, Conn. Gen.Stat. § 10–221, provides in pertinent part: "Boards of education shall prescribe rules for the management, studies, classification and discipline of the public schools . . . ." This statute contains no grant of authority to control the image of teachers for its own sake. The Board may regulate teacher image under the statute only if to do so would contribute to the management, studies or discipline of the schools, an issue related to the other asserted purposes for the regulation. *See Herzig v. Board of Education,* 152 Conn. 144, 150, 204 A.2d 827, 830 (1964) ("local boards of education are agencies of the state . . . and . .

---

4. We recognize that this view contrasts with the views of 1883, when Josiah Royce wrote that a teacher "may find of a sudden that his nonattendance at church, or the fact that he drinks beer with his lunch, or rides a bicycle, is considered of more moment than his power to instruct." *Quoted in* Note. *Academic Freedom in the Public Schools: The Right to Teach,* 48 N.Y.U.L.Rev. 1176, 1179 (1973).

4A. In this respect his views of communication are not unlike those of the President of the United States, who recently delivered his first "Fireside Chat" while pointedly wearing a cardigan sweater.

5. The Board also claims that its regulation builds respect for teachers among members of the public and that it creates an effective and efficient school system, but these abstract propositions appear to have no meaning apart from the three purposes listed above.

possess only such powers as are granted to them by the General Statutes expressly or by necessary implication").

Moreover, even if the Board had authority to require teachers to maintain a "professional image," that phrase is almost meaningless as applied to neckties for men. Informality is making inroads even in the staid legal profession, see In re DeCarlo, 141 N.J.Super. 42, 357 A.2d 273 (App.Div. 1976) (per curiam) (female attorney in slacks and sweater properly attired for court), and among other groups, male doctors, dentists, clergymen, engineers, and teacher—and particularly for the younger members of these groups—a tie is no longer mandatory and is far from typical. See also J. Frank, "The Cult of the Robe" in Courts on Trial 254–61 (1949). Considering the wide variations in the attire worn by professionals today, the Board's statement that it wants its teachers to wear ties to enhance their "professional image" amounts to little more than a statement that it wants them to wear ties because it wants them to wear ties. Such a purpose is plainly entitled to little or no weight.

As to the promotion of Good grooming among students, as an independent interest this also seems to be ultra vires the Board's statutory powers. The student hair regulations of this very school board, moreover, have been held unconstitutional by a state court. Yoo v. Moynihan, 28 Conn.Supp. 375, 262 A.2d 814 (Super.Ct.1969). Finally, even were the Board's second purpose to be considered legitimate, the connection between teacher and student dress is so tenuous, as a glance at any public high school classroom will confirm, that the Board's means—requiring its male teachers to surround their necks with a tie—lack the requisite "significant relationship" to the Board's end. Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972).

We turn, then, to the final asserted interest, the need for respect, discipline, and decorum in the classroom. This is certainly a valid concern of the school board, as Conn. Gen.Stat. § 10–221 makes clear. It is far from clear, however, that a tie code like that in issue here has any connection with respect or discipline. Indeed, appellant puts forward the seemingly more reasonable proposition, which we must accept at this stage, that being tieless helps him to maintain his students' respect.[6] Teenagers, who are so often rebellious against authority, may find a tieless teacher to be a less remote, more contemporary individual with whom they can more easily interact, and hence to whom they are better prepared to listen with care and attention.[7] It is highly questionable, and certainly not established on this motion for summary judgment, that the Board's valid end of promoting discipline is substantially, or even incrementally, furthered by its tie regulation.[8]

6. Appellant is peculiarly well situated to assert this claim, since he teaches both English, where a tie is required, and film-making, where it is not.

7. The fact that the School Board allows teachers to be tieless for "rap sessions" is in effect a concession of this point. If for purposes of "rapping," why not for purposes of teaching? Socrates and his students certainly equated the two.

8. There is one additional interest that, while not explicitly asserted, may underlie the extremely weak interests advanced by the school board here: an interest in standardization or uniformity. Such a state interest cannot be recognized in the courts. All may not be forced by a school board to share the beliefs of the majority, whether it be a theory of the world's creation, Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), a belief in saluting the flag, West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), or a belief that the German language is evil, Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). See Project, Education and the Law: State Interests and Individual Rights, 74 Mich.L.Rev. 1373, 1457–59 (1976). This must be so "if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." West Virginia State Board of Education v. Barnette, supra, 319 U.S. at 637, 63 S.Ct. at 1185. The Bill of Rights forbids us to adopt the credo of the Good Citizens' League of Zenith "that American Democracy . . . demand[ed] a wholesome sameness of thought, dress, painting, morals, and vocabulary." S.

## IV. THE BALANCE

In view of our finding in the preceding section that the Board's articulated interests carry very little weight, we conclude that the decision below must be reversed. The requirement that teachers wear ties appears, at this stage of the proceedings, to be one of those "purposeless restraints" to which Mr. Justice Harlan referred, *Poe v. Ullman, supra,* 367 U.S. at 543, 81 S.Ct. 1752, in contrast to the many legitimate personal appearance regulations that further substantial state purposes, *see, e. g., Kelley v. Johnson, supra* (hair of policemen); *Miller v. School District No. 167,* 495 F.2d 658, 664 & nn.20–22 (7th Cir. 1974) (Stevens, J.) (dictum) (State may make hair regulations for restaurant kitchens for public health reasons, require headgear for miners and motorcyclists for safety reasons, and prohibit indecent exposure). Certainly a school board may make regulations that help to promote the effective and efficient education of children. It may not, however, make regulations that infringe on constitutional interests while not realistically and significantly furthering the board's proper purposes.

The regulation at issue here implicates both a Fourteenth Amendment liberty interest and a First Amendment interest.[9] The intersection of these two interests calls for a higher degree of scrutiny of the government's countervailing interest than would be the presence of either individual interest alone. *See Police Department of Chicago v. Mosley,* 408 U.S. 92, 98–99, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (equal protection analysis—higher level of scrutiny

required because both First and Fourteenth Amendment interests involved). *See also* Gunther, *supra,* 86 Harv.L.Rev. at 7 ("responsible 'balancing' " requires careful identification and separate evaluation of "each analytically distinct ingredient of the contending interests"). Thus we cannot "accept unquestioningly the school authorities' judgment as to the effects of classroom conduct or speech," *James v. Board of Education,* 461 F.2d 566, 575 n. 22 (2d Cir.), *cert. denied,* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972), but rather must require a regulation of the sort at issue here to be "drawn as narrowly as possible to achieve the social interests that justify it" and to be "reasonably related to the needs of the educational process," *id.* at 574. At this stage of the proceedings, the Board has plainly failed to carry this burden, and its asserted interests are far outweighed by the individual interests at stake.

We accordingly vacate the summary judgment and remand for a hearing on the merits.

MESKILL, Circuit Judge (dissenting):

The majority opinion casts so dense a smokescreen about this case that one might easily lose sight of the narrow legal question involved. The East Hartford Board of Education ("board") has not attempted to emulate the Manchu conquerors of China or Peter The Great. The citizenry of East Hartford is not now marching about in "death's livery," pigtailed and clean-shaven as a result of the board's perfidy. Rather, those charged by law with the operation

---

Lewis, *Babbitt* 311 (Signet ed. 1961) (1st ed. 1922).

**9.** This distinguishes the instant situation from two cases in which courts of appeals have upheld dismissals of public school teachers. The dismissals were alleged to be for reasons related to personal appearance, although school officials in both cases asserted other, more substantial reasons for the dismissals. *Tardif v. Quinn,* 545 F.2d 761 (1st Cir. 1976) (length of teacher's skirt); *Miller v. School District No. 167,* 495 F.2d 658 (7th Cir. 1974) (beard and sideburns). In neither case was a First Amendment claim raised. *See* 545 F.2d at

763 n. 3; 495 F.2d at 662. In the *Tardif* case, moreover, it was conceded that the school officials' concern about the "disruptive effect" of the teacher's short skirts was not irrational, in marked contrast to the situation here. The *Tardif* court itself recognized that its decision might well be different in a case like the instant one:

> Once even a small, as distinguished from a fundamental, constitutional right is shown to be involved, an employee might succeed by showing the invasion so irrational as to demonstrate lack of good faith.

545 F.2d at 764.

and control of the public schools have required that the male teachers in their employ wear ties at work in most circumstances. The appellant claims that this is prohibited by the Constitution, a conclusion which the majority supports with great indignation but little precedent or logic. Because I am convinced that the board's action does not violate the Constitution, I respectfully dissent from the majority opinion.

I. *Teaching as a First Amendment Activity; The Role of the Federal Courts.*

In the vast majority of communities, the control of public schools is vested in locally-elected bodies.[1] As has been noted many times by both state and federal courts, this commitment to local political bodies implies significant public control over what is said and done in school. *See* Note, Developments in the Law—Academic Freedom, 81 Harv.L.Rev. 1045, 1052–54 (1968); *Eisner v. Stamford Board of Education,* 440 F.2d 803, 807–08 (2d Cir. 1971). It is not the federal courts, but local democratic processes, that are primarily responsible for the many routine decisions that are made in any school system. Accordingly, it is settled that "[c]ourts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate constitutional values." *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).

If this sound doctrine of local control is to have any meaning, it is necessary that the federal courts refrain, in most instances, from interfering with the decisions of school authorities. Decisions of local boards may be foolish or unwise, and still pass constitutional muster. We do the court a grave disservice when we enforce, in the name of the Constitution, the pet educational theories of the federal bench, whatever they may be. In the guise of enforcing federal law, we transform ourselves into a federal school board, deciding on the appropriateness of textbooks, or, as here, settling the scope of a dress code. Such decisions have no place in the federal courts so long as school authorities stay within the broad area committed to their discretion.

Only last term, the Supreme Court made precisely this point in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), which dealt with a high school's summary disciplinary proceedings, challenged on due process grounds. Mr. Justice White stated for the Court:

It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.

.     .     .     .     .

The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal-court corrections of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.

*Id.* at 326, 95 S.Ct. at 1003.

The notion that teaching is itself a "First Amendment activity" stands this policy on its head. Under such a rule, it is clear that any action taken by a school board will "sharply and directly implicate constitutional values," and the rule set out in *Epperson* and *Wood* will be reduced to an empty formula. Under the majority's holding, every public school teacher who feels that his employers have made an incorrect decision will be able to invoke the aid of the federal courts. The result will be either endless and expensive litigation over the trivia of education or a complete abdication of responsibility by local school boards.

In short, the majority's opinion is nothing more than a vehicle by which federal judges may enforce their concepts of sound educational policy against the wishes of locally-elected bodies, specifically charged by law

1. *See* R. Campbell, L. Cunningham & R. McPhee, The Organization and Control of American Schools 164–70 (1965).

with making these decisions. As Judge Mulligan wrote for a unanimous panel in *Presidents Council, District 25 v. Community School Board No. 25*, 457 F.2d 289 (2d Cir.), *cert. denied*, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972):

> The ensuing shouts of book burning, witch hunting and violation of academic freedom hardly elevate this intramural strife to first amendment constitutional proportions. If it did, there would be a constant intrusion of the judiciary into the internal affairs of the school. Academic freedom is scarcely fostered by the intrusion of three or even nine federal jurists making curriculum or library choices for the community of scholars. When the court has intervened, the circumstances have been rare and extreme and the issues presented totally distinct from those we have here.

*Id.* at 292. In that case, we upheld the action of a school board in limiting library access and forbidding further purchase of a book it found objectionable. First Amendment rights were implicated far more clearly there than in the instant case. We should follow the holding of *Presidents Council* and keep the courts out of the business of education.

II. *The Symbolic Speech Claim.*

The mere fact that the plaintiff has invoked the magical phrase "First Amendment" casts no burden on the state. In cases involving expressive conduct, the threshold requirement is that the plaintiff demonstrate that his activities are arguably within the scope of the amendment. Appellant has failed to do so.

Appellant claims that by refusing to wear a tie, he communicates an entire set of values to his students. Specifically, in his

brief he claims the following benefits from his mode of dress:

> (a) He wishes to present himself to his students as a person who is not tied to "establishment conformity."
>
> (b) He wishes to symbolically indicate to his students his association with the ideas of the generation to which those students belong, including the rejection of many of the customs and values, and of the social outlook, of the older generation.
>
> (c) He feels that dress of this type enables him to achieve closer rapport with his students, and thus enhances his ability to teach.[2]

Appellant's claim, therefore, is that his refusal to wear a tie is "symbolic speech," and, as such, is protected against governmental interference by the First Amendment.

Obviously, a great range of conduct has this symbolic, "speech-like" aspect; the claim has been advanced for any number of activities.[3] To state that activity is "symbolic" is only the beginning, and not the end, of constitutional inquiry. *United States v. Miller*, 367 F.2d 72, 78–79 (2d Cir. 1966), *cert. denied*, 386 U.S. 911, 87 S.Ct. 855, 17 L.Ed.2d 787 (1967). *See* Note, 66 Mich.L.Rev. 1040, 1046 (1968); *cf. People v. Cowgill*, 274 Cal.App.2d Supp. 923, 78 Cal. Rptr. 853, *appeal dismissed*, 396 U.S. 371, 90 S.Ct. 613, 24 L.Ed.2d 590 (1970) (Harlan, *J.,* dissenting from dismissal). Even though intended as expression, symbolic speech remains conduct, subject to regulation by the state. As the Supreme Court has stated in discussing the difference between conduct and "speech in its pristine form":

> We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same

---

**2.** This final claim does not arise out of the First Amendment, but is merely an assertion that one teaching technique is to be preferred over another. It no more implicates a constitutional interest than would a claim that closer "rapport" could be achieved by arranging students' desks in a circle rather than in rows.

**3.** Thus, as Professor Kalven noted, "[p]olitical assassination is a gesture of protest, too, but no

one is disposed to work up any First Amendment enthusiasm for it." H. Kalven, The Negro and the First Amendment 133 (1965). And see *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), in which the Supreme Court held that the First Amendment did not invalidate a conviction for burning a draft card to protest the Vietnam War.

kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech. . . . We reaffirm the statement of the Court in *Giboney v. Empire Storage & Ice Co.,* [336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949)] that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."

*Cox v. Louisiana,* 379 U.S. 536, 555–56, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965) (citations omitted). The rule of *Cox,* which involved a mixture of activity and speech, applies with even greater force in a case such as this one, where only conduct is involved. *See United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

Thus, we are required to balance the alleged interest in free expression against the goals of the school board in requiring its teachers to dress somewhat more formally than they might like. *United States v. Miller, supra,* 367 F.2d at 80. *Compare* Karst, Legislative Facts in Constitutional Litigation, 1960 Supreme Court Review 75, 77–81 *with* Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 912–14 (1963). Let us consider the factors involved in this balancing test.

As conduct becomes less and less like the "pure speech" explicitly protected by the First Amendment, the showing of governmental interest required is progressively lessened. *See* Alfange, Jr., Free Speech and Symbolic Expression: The Draft Card Burning Case, 1968 Supreme Court Review 1, 22–27; Note, Symbolic Speech, 43 Fordham L.Rev. 590, 592–93 (1975); Note, Symbolic Conduct, 68 Colum.L.Rev. 1091, 1121–25 (1968). In those cases where governmental regulation of expressive conduct has been struck down, the communicative intent of the actor was clear and "closely akin to 'pure speech.'" *Tinker v. Des Moines School District,* 393 U.S. 502, 505, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Thus, the First Amendment has been held to protect wearing a black armband to protest the Vietnam War, *Tinker v. Des Moines School District, supra,*[4] burning an American Flag to highlight a speech denouncing the government's failure to protect a civil rights leader, *Street v. New York,* 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969), or quietly refusing to recite the Pledge of Allegiance, *Russo v. Central School District,* 469 F.2d 623 (2d Cir. 1972), *cert. denied,* 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973).

In contrast, the claims of symbolic speech made here are extremely diffuse.[5] Through the simple refusal to wear a tie, Mr. Brimley claims that he communicates a comprehensive view of life and society. It may well be, in an age increasingly conscious of fashion, that a significant portion of the population seeks to make a statement of some kind through its clothes. *See* Q. Bell, On Human Finery (2d ed. 1976). However, I find Mr. Brimley's message sufficiently vague to place it close to the "conduct" end of the "speech-conduct" continuum described above. *Cf.* Henkin, The Su-

---

**4.** It is significant that the *Tinker* Court itself was careful to distinguish a prohibition on the wearing of an armband from a dress code:
The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style, or deportment. * * * Our problem involves direct, primary First Amendment rights akin to "pure speech."
393 U.S. at 508–09, 89 S.Ct. at 737. At least three Circuits have rejected the claim that long hair is expressive conduct entitled to First Amendment protection. *Richards v. Thurston, infra; Freeman v. Flake,* 448 F.2d 258 (10th

Cir. 1971), *cert. denied,* 405 U.S. 1032, 92 S.Ct. 1292, 31 L.Ed.2d 489 (1972); *Karr v. Schmidt,* 460 F.2d 609 (5th Cir.) (*en banc*), *cert. denied,* 409 U.S. 989, 93 S.Ct. 307, 34 L.Ed.2d 256 (1972).

**5.** At least one commentator has suggested that conduct which involves no departure from the actor's normal routine, but is merely a preference of personal appearance, is never symbolic conduct entitled to First Amendment protection. Note, Symbolic Conduct, 68 Colum.L. Rev. 1091, 1117 (1968).

preme Court 1967 Term—Foreword: On Drawing Lines, 82 Harv.L.Rev. 63, 76–81 (1968). While the regulation of the school board must still pass constitutional muster, the showing required to uphold it is significantly less than if Mr. Brimley had been punished, for example, for publicly speaking out on an issue concerning the quality of the schools. *Richards v. Thurston,* 424 F.2d 1281 (1st Cir. 1970); *see Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

At the outset, Mr. Brimley had other, more effective means of communicating his social views to his students. He could, for example, simply have told them his views on contemporary America; if he had done this in a temperate way, without interfering with his teaching duties, the school board would be without power to punish him. *Presidents Council, supra,* 457 F.2d at 293. *See* Van Alstyne, The Constitutional Rights of Teachers and Professors, 1970 Duke L.J. 841, 856. The existence of alternative, effective means of communication, while not conclusive, is certainly a factor in assessing the validity of a regulation of expressive conduct. *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949); *Connecticut State Federation of Teachers v. Board of Education,* 538 F.2d 471, 481–82 (2d Cir. 1976).

Against appellant's claim of free expression is the school board's interest in promoting respect for authority and traditional values, as well as discipline in the classroom, by requiring teachers to dress in a professional manner.[6] The dress code here, while certainly not to everyone's taste, is a rational means of promoting these goals. As to the legitimacy of the goals themselves, there can be no doubt. As Chief Judge Kaufman stated in *James v. Board of Education,* 461 F.2d 566 (2d Cir. 1972):

> The interest of the state in promoting the efficient operation of its schools extends beyond merely securing an orderly classroom. Although the pros and cons of progressive education are debated heatedly, a principal function of all elementary and secondary education is indoctrinative—whether it be to teach the ABC's or multiplication tables or to transmit the basic values of the community.

*Id.* at 573.[7] *See also Miller v. School District,* 495 F.2d 658, 664 (7th Cir.) (Stevens, J.), *reh. denied,* 500 F.2d 711 (1974) ("desire to encourage respect for tradition" sufficient to uphold a dress code for teachers).

The majority is inconsistent when it credits Mr. Brimley's notion that tielessness carries a message to his students, but belittles the board's conclusion that wearing a tie is equally expressive. Professor Cox was far more sympathetic to the board's point of view. As the majority observes, he noted Mr. Brimley's sincerity, but further stated:

> The School Board feels no less deeply and strongly that the atmosphere of the classroom and attitude of the students are sufficiently affected by teacher's clothing for it to require a necktie and jacket.

The majority goes to great lengths to argue on policy grounds against the board's

6. There is no reason to prefer Mr. Brimley's notion of what constitutes a "professional image." In *Tardif v. Quinn,* 545 F.2d 761 (1st Cir. 1976), from which the majority somehow draws support, changing standards of professional dress were explicitly noted, and yet a dismissal for violation of a dress code was upheld:

> The court, having taken a view, found that plaintiff's dresses, which came "half-way down [her] thigh," were "comparable in style to dresses worn by young, respectable professional women during the years when the plaintiff was teaching." It further found that her dresses in fact "had no startling or adverse effect on her students or on her effectiveness as a teacher."

> We will assume that by this finding the court meant that plaintiff's dress length was within reasonable limits, and we further assume that this finding was warranted. On the other hand, the court's independent judgment as to the impact and propriety of plaintiff's dress does not amount to a finding that defendants' objections to the length were irrational in the context of school administration concerns.

*Id.* at 763.

7. The inculcation of community values has been a goal of American public education since its very beginning. *See* The Massachusetts School Laws of 1642 and 1647; Northwest Ordinance, Art. 3 (1787).

decision. Our function as a court is not to endorse the "better" or more "progressive" policy. Rather, as *Kelley v. Johnson,* 425 U.S. 238, 248, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976), makes clear, we are to assess the regulations and strike down only those which are so "arbitrary as to be branded irrational." There is a world of difference between "unwise" and "irrational." My dissent is not based on my belief in the efficacy of ties, but rather on my firm conviction that it is no part of judicial business to express any opinion at all on such questions. The argument made by appellant, and adopted by the majority, was properly addressed to the board, which considered and rejected it. I can see no reason to create a constitutional preference for the decision of an individual teacher in these matters over that of his employers.

III. *Academic Freedom in the Public Schools.*

In the public high school, as elsewhere, the concept of academic freedom is a meaningful limitation on the power of those in command to stifle dissent and control thought. *Eisner v. Stamford Board of Education,* 440 F.2d 803 (2d Cir. 1971). At the same time, however, the First Amendment leaves undisturbed the power of local officials to prescribe the curriculum and teaching techniques of the schools in their care.[8] *Id. See* Goldstein, The Asserted Constitu-

tional Right of Public School Teachers to Determine What They Teach, 124 U.Pa.L. Rev. 1293 (1976). Thus, even if I agreed with the majority that a substantial First Amendment interest was involved, I would have difficulty concurring in the remand of this case.[9]

While teachers do not abandon their First Amendment rights when they accept public employment, exercise of free expression in the schoolroom is necessarily limited to a degree impermissible in public.[10] Who could question, for example, that a biology teacher who spent all his time explaining his political views rather than teaching biology could properly be disciplined. The constraints which apply in pure speech cases necessarily apply in symbolic speech cases as well.

The majority furthermore blurs the crucial distinction between secondary and higher education. In the secondary school, the students are a captive audience and the teacher, whom they have not chosen, is far more able to enforce his views upon his class than is a college professor. *See Tilton v. Richardson,* 403 U.S. 672, 685–86, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (plurality opinion). Accordingly, I can see no reason to prefer Mr. Brimley's attempt to indoctrinate his students with the values implicit in tielessness, if any, rather than the board's desire to inculcate the values connoted by wearing ties.

---

**8.** Apparently realizing that the board must have something to control, the majority is willing to allow it to determine matters of "content of curriculum." They then go on to observe that the function of the secondary school teacher as a role model is in many ways the most significant part of teaching. The paradoxical result of this is that the board is left with control of the less important aspects of education. It seems logical to assume that the importance of the teacher as a role model provides substantial justification for public control of non-curricular matters. *See* Goldstein, *supra,* at 1328 n.118.

**9.** One can easily call to mind special situations other than the public schools in which First Amendment rights such as those asserted here may be curtailed. Thus, the New York Court of Appeals has upheld a ban on a lawyer who

was also a Catholic Priest from appearing before a jury in clerical garb. *LaRocca v. Lane,* 37 N.Y.2d 575, 376 N.Y.S.2d 93, 338 N.E.2d 606 (1976) (Breitel, *Ch. J.*), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1464, 47 L.Ed.2d 734 (1976). There, constitutionally protected rights were implicated far more sharply than here. However, the legitimate interests of the state in assuring a fair trial outweighed the incidental burden on First Amendment freedom.

**10.** The special needs of the school environment limit the First Amendment rights not only of teachers, but of the general public as well. Thus, ordinarily protected activities, such as picketing and chanting, may constitutionally be prohibited near a school. *Grayned v. Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

IV. *Appellant's Status as a Public Employee.*

The appellant does not appear as a member of the public at large, but as a governmental employee. As Mr. Justice Marshall stated in *Pickering v. Board of Education, supra,* 391 U.S. at 568, 88 S.Ct. at 1734:

[I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

For a proper purpose, the First Amendment rights of public employees may be curtailed to a significant degree. In *Civil Service Commission v. Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), and *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the Supreme Court upheld sweeping restrictions on political activity by public servants. If curtailment of activities which lie at the core of the First Amendment is permissible, I am unable to see why this minor infringement of "expression" in a symbolic speech case, if it even amounts to that, violates the Constitution. In any event, due consideration should be given to this doctrine before any court invalidates a rule like the one at issue. Very little, if any, attention is paid to appellant's employment status in this case; a reader of the majority opinion having been exposed to the question might well conclude that the board was seeking to make everyone in East Hartford wear a tie to work. As the Supreme Court states in *Kelley*:

Respondent has sought the protection of the Fourteenth Amendment, not as a member of the citizenry at large, but on the contrary as an employee of the police force of Suffolk County, a subdivision of the State of New York. While the Court of Appeals made passing reference to this distinction, it was thereafter apparently ignored. We think, however, it is highly significant.

425 U.S. at 244–45, 96 S.Ct. at 1444. The distinction retains its significance in this case. By ignoring appellant's status as a public employee, I fear the Court is repeating the error criticized in *Kelley*.

V. *Kelley v. Johnson and the Burden of Proof.*

Governments are given wide latitude in the "dispatch of [their] own internal affairs." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961). Accordingly, most legislative decisions are presumed to be valid, *Dean v. Gadsden Times Pub. Co.,* 412 U.S. 543, 93 S.Ct. 2264, 37 L.Ed.2d 137 (1973); *Ferguson v. Skrupra,* 372 U.S. 726, 730–32, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *Day-Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 423, 72 S.Ct. 405, 96 L.Ed. 469 (1952), and the burden is on the plaintiff to demonstrate that the challenged law is so irrational that it could serve no legitimate state interest. *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 99 L.Ed.2d 563 (1955); *see United Public Workers v. Mitchell,* 330 U.S. 75, 100–01, 67 S.Ct. 556, 91 L.Ed. 754 (1947).[11]

This Court departed from these principles in *Dwen v. Barry,* 483 F.2d 1126 (2d Cir. 1973), where it was decided that the grooming regulations of the Suffolk County Po-

---

11. The exceptions to this ordinary test in constitutional litigation remain those of Justice Stone's celebrated *Carolene Products* footnote; the state must carry the burden of proof when it discriminates against an insular minority or burdens the exercise of a "fundamental" right. *United States v. Carolene Products,* 304 U.S. 144, 152 n.4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312–14, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *compare id.* at 658–63, 89 S.Ct. 1322 (Harlan, J., dissenting); *see* Gunther, The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model For a Newer Equal Protection, 86 Harv. L.Rev. 1 (1972).

lice Department intruded upon the "liberty" interests of its employees. Accordingly, the Court reversed the dismissal of the complaint and remanded for a trial in which the Department could attempt to carry "the burden of establishing a genuine public need for the regulation." *Id.* at 1131. On remand, the district court found that the burden had not been met, and this Court affirmed. 508 F.2d 836 (2d Cir. 1975).

The Supreme Court reversed *sub nom. Kelley v. Johnson,* and applied the "rational relation" test to the claim:

Thus the question is not, as the Court of Appeals conceived it to be, whether the State can "establish" a "genuine public need" for the specific regulation. It is whether respondent can demonstrate that there is no rational connection between the regulation, based as it is on the county's method of organizing its police force, and the promotion of safety of persons and property. *United Public Workers v. Mitchell,* 330 U.S. 75, 100–101 [67 S.Ct. 556, 569–570, 91 L.Ed. 754, 773–774] (1947); *Jacobson v. Massachusetts,* 197 U.S. 11, 30–31, 35–37 [25 S.Ct. 358, 363, 365–366, 49 L.Ed. 643, 651–652, 653–654] (1905).

We think the answer here is so clear that the District Court was quite right in the first instance to have dismissed respondent's complaint. Neither this Court, the Court of Appeals, nor the District Court is in a position to weigh the policy arguments in favor of and against a rule regulating hairstyles as a part of regulations governing a uniformed civilian service. The constitutional issue to be decided by these courts is whether petitioner's determination that such regulations should be enacted is so irrational that it may be branded "arbitrary," and therefore a deprivation of respondent's "liberty" interest in freedom to choose his own hairstyle. *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487–88 [75 S.Ct. 461, 464–465, 99 L.Ed.2d 563, 571–572] (1955).

*Kelley v. Johnson,* 425 U.S. 238, 247–48, 96 S.Ct. 1440, 1446, 47 L.Ed.2d 708 (1976).[12]

The majority opinion, ignoring controlling precedent, returns to the discredited reasoning of *Dwen v. Barry,* and explicitly places the burden of justifying the dress code upon the board. In distinguishing *Kelley,* the majority relies on the truism that policemen are different from teachers.[13] This is a distinction without a difference for constitutional purposes.

*Kelley* determines that the right of public employees to dress as they please is not "fundamental" in the constitutional sense. Accordingly, the state carries no burden of justification in this case. Rather, the plaintiff must demonstrate that the dress code is so arbitrary that it serves no legitimate interest of the board.

It goes without saying that the result which we might reach for a police department will often differ from that for a school district.[14] I would happily join in striking down a requirement that teachers all wear blue uniforms with insignia of rank; I take it that the majority would join me in upholding such a regulation for a police department. However, the fact that the *results* of two challenges to the same regulation might differ in no way implies that a different constitutional *test* is called

---

**12.** It is significant that the *Kelley* Court, unlike the majority here, did not remand for a trial. Rather, the fact that the state was able to advance a non-frivolous ground for its rule was sufficient to defeat the claim.

**13.** In *Quinn v. Muscare,* 425 U.S. 560, 96 S.Ct. 1752, 48 L.Ed.2d 165 (1976), the Supreme Court, in considering the validity of the Chicago Fire Department's "personal appearance regulation" stated: "*Kelley v. Johnson* renders immaterial the District Court's factual determination regarding the safety justification for the Department's hair regulation about which the Court of Appeals expressed doubt." *Id.* at 562, 96 S.Ct. at 1753–1754. Although firemen are, like policemen, a uniformed service, *Quinn* points toward a general application of *Kelley* to all public employees.

**14.** It is interesting that in *Dwen v. Barry,* policemen were carefully distinguished from the military, and classed with civilian employees for the purposes of the case. Here, we are told that the dividing line has moved, and that the "paramilitary" nature of the police distinguishes away *Kelley.*

for. There is no authority for the position that teachers are entitled to a stricter constitutional test than are other government employees.[15] *See Garrity v. New Jersey,* 385 U.S. 493, 499–500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

## VI. *The "Liberty" Claim.*

The majority also agrees with the appellant that the substantive "liberty" protected by the due process clause is a bar to the imposition of this dress code. I cannot agree with this trivialization of an important and evolving constitutional doctrine.

As the majority concedes, *Kelley* establishes that if this interest applies at all in the context of a public employee's personal appearance, it is less weighty than rights associated with "procreation, marriage and family life" which are the values at the core of this "right to be let alone." *Kelley* makes it clear that the public employee has no absolute right to appear as he pleases, but must yield to a legitimate governmental interest. *Cf.* Henkin, Privacy and Autonomy, 74 Colum.L.Rev. 1410, 1429–33 (1974). As with the First Amendment claim, the board's concern with classroom atmosphere and decorum provides a rational basis for the dress code. Appellant has failed to meet his burden of demonstrating that the rule is arbitrary; accordingly, it should be upheld.

The demands of neither the board nor the appellant are eccentric or extreme. If Mr. Brimley were a nudist insisting on his right to teach without any clothes at all,[16] or had the board insisted that its teachers wear an outlandish costume, this would be a different case. However, even in the broad middle ground, the way in which one dresses is subject to significant control. In *Miller v. School District, supra,* a dress code for teachers was upheld against a similar challenge. Mr. Justice Stevens, then a member of the Court of Appeals, stated:

> Even if we assume for purposes of decision that an individual's interest in selecting his own style of dress or appearance is an interest in liberty, it is nevertheless perfectly clear that every restriction on that interest is not an unconstitutional deprivation.
>
> From the earliest days of organized society, no absolute right to an unfettered choice of appearance has ever been recognized; matters of appearance and dress have always been subjected to control and regulation, sometimes by custom and social pressure, sometimes by legal rules. A variety of reasons justify limitations on this interest. They include a concern for public health or safety, a desire to avoid specific forms of antisocial conduct, and an interest in protecting the beholder from unsightly displays. Nothing more than a desire to encourage respect for tradition, or for those who are moved by traditional ceremonies, may be sufficient in some situations. Indeed, even an interest in teaching respect for

**15.** This constitutional error is compounded by the majority's holding that the plaintiff is entitled to a higher standard of review because he has invoked more than one constitutional provision. *See California Bankers Ass'n v. Schultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974) (First, Fourth and Fifth Amendment interests analyzed separately); *and see Freeman v. Flake,* 448 F.2d 258, 260 (10th Cir. 1971), *cert. denied,* 405 U.S. 1032, 92 S.Ct. 1292, 31 L.Ed.2d 489 (1972) (First, Fourth, Eighth, Ninth, Tenth and Fourteenth Amendments invoked by plaintiffs challenging dress codes). This novel doctrine, derived in some manner from *Police Department of Chicago v. Mosley,* 408 U.S. 92, 98–99, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), is unprecedented. *Mosley* was an application of the familiar principle that a classification that burdens the exercise of a

"fundamental" right calls for strict scrutiny for equal protection purposes. I am unable to see how the majority's new canon of constitutional interpretation can be extracted from the case. To the contrary, the Supreme Court has made it clear that symbolic speech is subject to a lower standard of scrutiny. *United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

Moreover, if we are to have workable rules of constitutional law, the result cannot turn upon the subjective intent of the one engaging in conduct such as this. *Karr v. Schmidt,* 460 F.2d 609, 614 (5th Cir. 1972) (*en banc*).

**16.** The example is not so far-fetched as it may appear. *See* "Teacher Will Appeal Ouster Over Nudity," New York Times, Friday, Oct. 8, 1976.

(though not necessarily agreement with) traditional manners, may lend support to some public grooming requirements. Therefore, just as the individual has an interest in a choice among different styles of appearance and behavior, and a democratic society has an interest in fostering diverse choices, so also does society have a legitimate interest in placing limits on the exercise of that choice.

495 F.2d at 664.

Contrary to the majority's casual dismissal of the case, *Miller* is highly apposite here. First, it involved a dismissal rather than, as here, a reprimand. More importantly, it involved both a dress code and a grooming requirement. One who is forced, like the *Kelley* and *Miller* plaintiffs, to shave his beard or cut his hair is forced to appear that way off as well as on the job, unless he accepts the inconvenience and additional expense of wearing an artificial beard, moustache or hairpiece. In contrast, Mr. Brimley can remove his tie as soon as the school day is over. Thus, the dress code relates solely to the working day; he may dress as he pleases after hours. *See Tardif v. Quinn*, 545 F.2d 761, 763 (1st Cir. 1976). Against this minimal intrusion upon appellant's privacy, if any, is the board's concern for discipline and authority in the classroom, as well as teaching respect for tradition.[17] I am unable to see how, under the test set forth in *Kelley*, the dress code here is so irrational that the alleged interest in privacy would prevail.

The only other Court of Appeals which has considered this issue has reached a similar conclusion. In the case of a public school teacher dismissed for wearing short skirts, the First Circuit stated:

. . . [W]e are not dealing with personal appearance in what might be termed an individual sense, but in a bilateral sense—a contractual relationship. Whatever constitutional aspect there may be to one's choice of apparel generally, it is hardly a matter which falls totally beyond the scope of the demands which an employer, public or private, can legitimately make upon its employees. We are unwilling to think that every dispute on such issues raises questions of constitutional proportions which must stand or fall, depending upon a court's view of who was right.

*Tardif v. Quinn, supra,* 545 F.2d at 763 (citations omitted).[18]

Each claim of substantive liberty must be judged in the light of that case's special circumstances. In view of the uniquely influential role of the public school teacher in the classroom, the board is justified in imposing this regulation. As public servants in a special position of trust, teachers may properly be subjected to many restrictions in their professional lives which would be invalid if generally applied. *See James, supra,* 461 F.2d at 573. I would join the sound views of the First and Seventh Circuits, and follow *Kelley* by holding that a school board may, if it wishes, impose reasonable regulations governing the appearance of the teachers it employs. There being no material factual issue to be decid-

17. The school board made a good faith effort to limit the reach of the dress code to classes in which the values it promoted were believed to be significant. Thus, Mr. Brimley was required to wear a tie while teaching a conventional English class, but not while giving an "alternative" class in filmmaking. Whatever the merits of this distinction, it demonstrates that the board's action was not merely an attempt to make teachers conform.

18. The First Circuit has also rejected the First Amendment claim made here. That Court has held that a student's long hair is not sufficiently expressive to justify First Amendment protection, although it is a vague attempt to identi-

fy with certain values. *Richards v. Thurston, supra.*

*Miller* and *Tardif* are the only cases of which I am aware in which a Court of Appeals has passed on the question of teacher dress codes. However, the claim that such regulations violate the Constitution has fared equally badly in the state courts. *See, e. g., Morrison v. Hamilton County Board of Education,* 494 S.W.2d 770 (Tenn.1973), *cert. denied,* 414 U.S. 1044, 94 S.Ct. 548, 38 L.Ed.2d 335 (1974); *Blanchet v. Vermilion Parish School Board,* 220 So.2d 534 (La.App.), *writ denied,* 254 La. 17, 222 So.2d 68 (1969); *but see Finot v. Pasadena City Board of Education,* 250 Cal.App.2d 189, 58 Cal.Rptr. 520 (1967).

ed, the grant of summary judgment should be affirmed.

Before KAUFMAN, Chief Judge, and SMITH, FEINBERG, MANSFIELD, MULLIGAN, OAKES, TIMBERS, GURFEIN, VAN GRAAFEILAND and MESKILL, Circuit Judges.

On Petition for Rehearing En Banc

MESKILL, Circuit Judge:

Although this case may at first appear too trivial to command the attention of a busy court, it raises important issues concerning the proper scope of judicial oversight of local affairs. The appellant here, Richard Brimley, is a public school teacher reprimanded for failing to wear a necktie while teaching his English class. Joined by the teachers union, he sued the East Hartford Board of Education, claiming that the reprimand for violating the dress code deprived him of his rights of free speech and privacy. Chief Judge Clarie granted summary judgment for the defendants. 405 F.Supp. 94 (D.Conn.1975). A divided panel of this Court reversed and remanded for trial. 562 F.2d at 838–856 (1977). At the request of a member of the Court, a poll of the judges in regular active service was taken to determine if the case should be reheard *en banc*. A majority voted for rehearing. We now vacate the judgment of the panel majority and affirm the judgment of the district court.

The facts are not in dispute. In February, 1972, the East Hartford Board of Edu-

cation adopted "Regulations For Teacher Dress." [1] At that time, Mr. Brimley, a teacher of high school English and filmmaking, customarily wore a jacket and sportshirt, without a tie. His failure to wear a tie constituted a violation of the regulations, and he was reprimanded for his delict. Mr. Brimley appealed to the school principal and was told that he was to wear a tie while teaching English, but that his informal attire was proper during filmmaking classes. He then appealed to the superintendent and the board without success, after which he began formal arbitration proceedings, which ended in a decision that the dispute was not arbitrable. This lawsuit followed. Although Mr. Brimley initially complied with the code while pursuing his remedies,[2] he has apparently returned to his former mode of dress.[3] The record does not disclose any disciplinary action against him other than the original reprimand.

I.

In the vast majority of communities, the control of public schools is vested in locally-elected bodies.[4] This commitment to local political bodies requires significant public control over what is said and done in school. *See Eisner v. Stamford Board of Education,* 440 F.2d 803, 807–08 (2d Cir. 1971); Developments in the Law—Academic Freedom, 81 Harv.L.Rev. 1045, 1052–54 (1968). It is not the federal courts, but local democratic processes, that are primarily responsible for

---

1. The entire dress code reads as follows:
   The attire of professional employees during the hours when school is in session must be judged in light of the following:
   1. Dress should reflect the professional position of the employee.
   2. Attire should be that which is commonly accepted in the community.
   3. It should be exemplary of the students with whom the professional employee works.
   4. Clothing should be appropriate to the assignment of the employee, such as slacks, and jersey for gym teachers.
   In most circumstances the application of the above criteria to classroom teachers would call for jacket, shirt and tie for men and dress, skirts, blouse and pantsuits for women.

If an individual teacher feels that informal clothing such as sportswear, would be appropriate to his or her teaching assignment, or would enable him or her to carry out assigned duties more effectively, such requests may be brought to the attention of the Principal or Superintendent. An attempt should be made on all levels to insure that the above principles are applied equitably and consistently throughout the school system.

2. *See* Arbitrator's Opinion at 7.

3. Interview with Richard Brimley, Hartford Courant, Feb. 28, 1977.

4. *See* R. Campbell, L. Cunningham & R. McPhee, The Organization and Control of American Schools 164–70 (1965).

the many routine decisions that are made in public school systems. Accordingly, it is settled that "[c]ourts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) (footnote omitted).

■ Federal courts must refrain, in most instances, from interfering with the decisions of school authorities. Even though decisions may appear foolish or unwise, a federal court may not overturn them unless the standard set forth in *Epperson* is met. The Supreme Court recently emphasized this point in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), in which a high school's summary disciplinary proceedings were challenged on due process grounds:

> It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. . . . The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal-court corrections of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.

*Id.* at 326, 95 S.Ct. at 1003 (citations omitted).

Because the appellant's clash with his employer has failed to "directly and sharply implicate basic constitutional values," we refuse to upset the policies established by the school board.

## II.

■ Mr. Brimley claims that by refusing to wear a necktie he makes a statement on current affairs which assists him in his

teaching. In his brief, he argues that the following benefits flow from his tielessness:

(a) He wishes to present himself to his students as a person who is not tied to "establishment conformity."

(b) He wishes to symbolically indicate to his students his association with the ideas of the generation to which those students belong, including the rejection of many of the customs and values, and of the social outlook, of the older generation.

(c) He feels that dress of this type enables him to achieve closer rapport with his students, and thus enhances his ability to teach.[5]

Appellant's claim, therefore, is that his refusal to wear a tie is "symbolic speech," and, as such, is protected against governmental interference by the First Amendment.

■ We are required here to balance the alleged interest in free expression against the goals of the school board in requiring its teachers to dress somewhat more formally than they might like. *United States v. Miller*, 367 F.2d 72, 80 (2d Cir. 1966), *cert. denied*, 386 U.S. 911, 87 S.Ct. 855, 17 L.Ed.2d 787 (1967). *Compare* Karst, Legislative Facts in Constitutional Litigation, 1960 Supreme Court Review 75, 77–81 *with* Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 912–14 (1963). When this test is applied, the school board's position must prevail.

Obviously, a great range of conduct has the symbolic, "speech-like" aspect claimed by Mr. Brimley. To state that activity is "symbolic" is only the beginning, and not the end, of constitutional inquiry. *United States v. Miller, supra*, 367 F.2d at 78–79; *see* Note, Desecration of National Symbols as Protected Political Expression, 66 Mich. L.Rev. 1040, 1046 (1968); *cf. People v. Cowgill*, 274 Cal.App.2d Supp. 923, 78 Cal.Rptr. 853, *appeal dismissed*, 396 U.S. 371, 90 S.Ct.

---

5. This final claim does not implicate the First Amendment. It is merely an assertion that one teaching technique is to be preferred over another. It has no more to do with a constitu-

tional interest than would a claim that closer "rapport" could be achieved by arranging students' desks in a circle rather than in rows.

613, 24 L.Ed.2d 590 (1970) (Harlan, *J.*, dissenting from dismissal). Even though intended as expression, symbolic speech remains conduct, subject to regulation by the state. As the Supreme Court has stated in discussing the difference between conduct and "speech in its pristine form":

> We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech. . . . We reaffirm the statement of the Court in *Giboney v. Empire Storage & Ice Co.* [336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949)], that "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."

*Cox v. Louisiana*, 379 U.S. 536, 555–56, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965). The rule of *Cox*, which involved a mixture of activity and speech, applies with even greater force in a case such as this one, where only conduct is involved. *See United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (burning of draft card as political protest not protected).

■ As conduct becomes less and less like "pure speech" the showing of governmental interest required for its regulation is progressively lessened. *See* Alfange, Jr., Free Speech and Symbolic Conduct: The Draft Card Burning Case, 1968 Supreme Court Review 1, 22–27; Note, Symbolic Speech, 43 Fordham L.Rev. 590, 592–93 (1975); Note, Symbolic Conduct, 68 Colum.L.Rev. 1091, 1121–25 (1968). In those cases where gov-ernmental regulation of expressive conduct has been struck down, the communicative intent of the actor was clear and "closely akin to 'pure speech.'" *Tinker v. Des Moines School District*, 393 U.S. 503, 505, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Thus, the First Amendment has been held to protect wearing a black armband to protest the Vietnam War, *Tinker v. Des Moines School District, supra*,[6] burning an American Flag to highlight a speech denouncing the government's failure to protect a civil rights leader, *Street v. New York*, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969), or quietly refusing to recite the Pledge of Allegiance, *Russo v. Central School District*, 469 F.2d 623 (2d Cir. 1972), *cert. denied*, 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973).

In contrast, the claims of symbolic speech made here are vague and unfocused. Through the simple refusal to wear a tie, Mr. Brimley claims that he communicates a comprehensive view of life and society. It may well be, in an age increasingly conscious of fashion, that a significant portion of the population seeks to make a statement of some kind through its clothes. *See* Q. Bell, On Human Finery (2d ed. 1976). However, Mr. Brimley's message is sufficiently vague to place it close to the "conduct" end of the "speech-conduct" continuum described above. *Cf.* Henkin, The Supreme Court 1967 Term—Foreword: On Drawing Lines, 82 Harv.L.Rev. 63, 76–81 (1968). While the regulation of the school board must still pass constitutional muster, the showing required to uphold it is significantly less than if Mr. Brimley had been punished, for example, for publicly speaking out on an issue concerning school administration. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *see Richards v. Thurston*, 424 F.2d 1281 (1st Cir. 1970).

---

**6.** The *Tinker* Court was careful to distinguish a prohibition on the wearing of an armband from a dress code:

> The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style, or deportment. . . . Our problem involves direct, primary First Amendment rights akin to "pure speech."

393 U.S. at 507–08, 89 S.Ct. at 737.

## III.

■ At the outset, Mr. Brimley had other, more effective means of communicating his social views to his students. He could, for example, simply have told them his views on contemporary America; if he had done this in a temperate way, without interfering with his teaching duties, we would be confronted with a very different First Amendment case. *See* Van Alstyne, The Constitutional Rights of Teachers and Professors, 1970 Duke L.J. 841, 856. The existence of alternative, effective means of communication, while not conclusive, is a factor to be considered in assessing the validity of a regulation of expressive conduct. *Connecticut State Fed'n of Teachers v. Board of Education*, 538 F.2d 471, 481–82 (2d Cir. 1976).

■ Balanced against appellant's claim of free expression is the school board's interest in promoting respect for authority and traditional values, as well as discipline in the classroom, by requiring teachers to dress in a professional manner. A dress code is a rational means of promoting these goals.[7] As to the legitimacy of the goals themselves, there can be no doubt. In *James v. Board of Education*, Chief Judge Kaufman stated:

> The interest of the state in promoting the efficient operation of its schools extends beyond merely securing an orderly classroom. Although the pros and cons of

progressive education are debated heatedly, a principal function of all elementary and secondary education is indoctrinative—whether it be to teach the ABC's or multiplication tables or to transmit the basic values of the community.

461 F.2d 566, 573 (2d Cir.), *cert. denied*, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972). *See also Miller v. School District*, 495 F.2d 658, 664 (7th Cir. 1974) (Stevens, J.).[8]

This balancing test is primarily a matter for the school board. Were we local officials, and not appellate judges, we might find Mr. Brimley's arguments persuasive. However, our role is not to choose the better educational policy. We may intervene in the decisions of school authorities only when it has been shown that they have strayed outside the area committed to their discretion. If Mr. Brimley's argument were to prevail, this policy would be completely eroded. Because teaching is by definition an expressive activity, virtually every decision made by school authorities would raise First Amendment issues calling for federal court intervention.

The very notion of public education implies substantial public control. Educational decisions must be made by someone; there is no reason to create a constitutional preference for the views of individual teachers over those of their employers.[9] As

---

7. The school board made an effort to limit the reach of the dress code to classes in which the values it promoted were believed to be significant. Thus, Mr. Brimley was required to wear a tie while teaching a conventional English class, but not while giving an "alternative" class in filmmaking. Whatever the merits of this distinction, it demonstrates that the board's action was taken in good faith, and was not merely an attempt to make teachers conform.

8. Appellant's position on this point is somewhat inconsistent. He claims that his tielessness carries a message of importance to his students, but belittles the board's belief that ties have any impact on classroom atmosphere. Professor Archibald Cox, the arbitrator in the earlier proceedings, was far more sympathetic to the board's position. In his opinion, he stated:

> The School Board feels no less deeply and strongly that the atmosphere of the classroom and attitude of the students are sufficiently affected by teacher's clothing for it to require a necktie and jacket.

Arbitrator's Opinion at 7.

9. Specifically, there is no reason to prefer Mr. Brimley's notion of what constitutes a "professional image" over that of the school board, even if the style he has chosen is acceptable in most schools. In *Tardif v. Quinn*, 545 F.2d 761 (1st Cir. 1976), a school teacher was fired for wearing short skirts. The Court stated:

> The [district] court, having taken a view, found that plaintiff's dresses, which came "half-way down [her] thigh," were "comparable in style to dresses worn by young, respectable professional women during the years when the plaintiff was teaching." It further found that her dresses in fact "had no

Judge Mulligan wrote for a unanimous panel in *Presidents Council v. Community School Board*, 457 F.2d 289 (2d Cir.), *cert. denied*, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972):

Academic freedom is scarcely fostered by the intrusion of three or even nine federal jurists making curriculum or library choices for the community of scholars. When the court has intervened, the circumstances have been rare and extreme and the issues presented totally distinct from those we have here.

*Id.* at 292. In that case, we upheld the action of a school board in limiting library access and forbidding further purchase of a book it found objectionable. First Amendment rights were implicated far more clearly there than in the instant case. *Presidents Council* clearly indicates the wide scope of school board discretion. When First Amendment rights are truly in jeopardy as a result of school board actions, this Court has not hesitated to grant relief. *See James v. Board of Education, supra; Russo v. Central School District, supra.* In contrast to *James* and *Russo*, the First Amendment claim made here is so insubstantial as to border on the frivolous.[10] We are unwilling to expand First Amendment protection to include a teacher's sartorial choice.

## IV.

Mr. Brimley also claims that the "liberty" interest grounded in the due process clause of the Fourteenth Amendment protects his choice of attire. *Cf. Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). This claim will not withstand analysis.

startling or adverse effect on her students or on her effectiveness as a teacher."

We will assume that by this finding the court meant that plaintiff's dress length was within reasonable limits, and we further assume that this finding was warranted. On the other hand, the court's independent judgment as to the impact and propriety of plaintiff's dress does not amount to a finding that defendants' objections to the length were irrational in the context of school administration concerns.

The Supreme Court dealt with a similar claim in *Kelley v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). That case involved a challenge to the hair-grooming regulations of a police department. The Court was careful to distinguish privacy claims made by government employees from those made by members of the public:

Respondent has sought the protection of the Fourteenth Amendment, not as a member of the citizenry at large, but on the contrary as an employee of the police force of Suffolk County, a subdivision of the State of New York. While the Court of Appeals made passing reference to this distinction, it was thereafter apparently ignored. We think, however, it is highly significant. In *Pickering v. Board of Education*, 391 U.S. 563, 568 [, 88 S.Ct. 1731, 20 L.Ed.2d 811] (1968), after noting that state employment may not be conditioned on the relinquishment of First Amendment rights, the Court stated that "[a]t the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." More recently, we have sustained comprehensive and substantial restrictions upon activities of both federal and state employees lying at the core of the First Amendment. *Civil Service Comm'n v. Letter Carriers*, 413 U.S. 548 [, 93 S.Ct. 2880, 37 L.Ed.2d 796] (1973); *Broadrick v. Oklahoma*, 413 U.S. 601 [, 93 S.Ct. 2908, 37 L.Ed.2d 830] (1973). If such state regulations may survive challenges based on the explicit language of the First Amendment, there is surely even more room for restrictive regulations of state

*Id.* at 763.

10. At least three Circuits have rejected the claim that long hair is expressive conduct entitled to First Amendment protection. *Richards v. Thurston, supra; Freeman v. Flake*, 448 F.2d 258 (10th Cir. 1971), *cert. denied*, 405 U.S. 1032, 92 S.Ct. 1292, 31 L.Ed.2d 489 (1972); *Karr v. Schmidt*, 460 F.2d 609 (5th Cir.) (*en banc*), *cert. denied*, 409 U.S. 989, 93 S.Ct. 307, 34 L.Ed.2d 256 (1972).

employees where the claim implicates only the more general contours of the substantive liberty interest protected by the Fourteenth Amendment.

*Id.* at 244–45, 96 S.Ct. at 1444.

The same distinction applies here. The regulation involved in this case affects Mr. Brimley in his capacity as a public school teacher.[11] Of course, as he points out, the functions of policemen and teachers differ widely. Regulations well within constitutional bounds for one occupation might prove invalid for another. Nonetheless, we can see no reason why the same constitutional test should not apply, no matter how different the results of their constitutional challenges. *See Garrity v. New Jersey,* 385 U.S. 493, 499–500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).[12]

*Kelley* goes on to set forth the standard to be applied in such cases:

We think the answer here is so clear that the District Court was quite right in the first instance to have dismissed respondent's complaint. Neither this Court, the Court of Appeals, nor the District Court is in a position to weigh the policy arguments in favor of and against a rule regulating hairstyles as a part of regulations governing a uniformed civilian service. The constitutional issue to be decided by these courts is whether petitioner's determination that such regu-

lations should be enacted is so irrational that it may be branded "arbitrary," and therefore a deprivation of respondent's "liberty" interest in freedom to choose his own hairstyle. *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487–88, [75 S.Ct. 461, 99 L.Ed. 563] (1955).

425 U.S. at 247–48, 96 S.Ct. at 1446. If Mr. Brimley has any protected interest in his neckwear, it does not weigh very heavily on the constitutional scales. As with most legislative choices, the board's dress code is presumptively constitutional.[13] It is justified by the same concerns for respect, discipline and traditional values described in our discussion of the First Amendment claim. Accordingly, appellant has failed to carry the burden set out in *Kelley* of demonstrating that the dress code is "so irrational that it may be branded 'arbitrary,'" and the regulation must stand.

The rights of privacy and liberty in which appellant seeks refuge are important and evolving constitutional doctrines. To date, however, the Supreme Court has extended their protection only to the most basic personal decisions. *See Carey v. Population Services Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). Nor has the Supreme Court been quick to expand these rights to new fields. *See Doe v. Commonwealth's Attorney for the City of Richmond,* 425 U.S. 901, 96 S.Ct. 1489, 47

---

11. It is not only appellant's status as a public employee, but the special needs of the school environment, that serve to justify the board's action. *See Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

12. In *Quinn v. Muscare,* 425 U.S. 560, 96 S.Ct. 1752, 48 L.Ed.2d 165 (1976), the Supreme Court, in considering the validity of the Chicago Fire Department's "personal appearance regulation" stated: "*Kelley v. Johnson* renders immaterial the District Court's factual determination regarding the safety justification for the Department's hair regulation about which the Court of Appeals expressed doubt." *Id.* at 562–63, 96 S.Ct. at 1753. Although firemen are, like policemen, a uniformed service, *Quinn* points towards a general application of *Kelley* to all public employees.

13. The exceptions to this ordinary test in constitutional litigation remain those of Justice

Stone's celebrated *Carolene Products* footnote; the state must carry the burden of proof when it discriminates against an insular minority or burdens the exercise of a "fundamental" right. *United States v. Carolene Products,* 304 U.S. 144, 152 n.4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312–14, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); compare *id.* at 658–63, 89 S.Ct. 1322, 22 L.Ed.2d 600 (Harlan, *J.,* dissenting); *see* Gunther, The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model For a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972). As *Kelley* makes clear, appellant's right to dress as he pleases, if it exists at all, is far from "fundamental" in the constitutional sense.

L.Ed.2d 751 (1976), *aff'g mem.*, 403 F.Supp. 1199 (E.D.Va.1975) (three judge court) (sodomy statute is constitutional as applied to private, consensual homosexual behavior). As with any other constitutional provision, we are not given a "roving commission" to right wrongs and impose our notions of sound policy upon society. There is substantial danger in expanding the reach of due process to cover cases such as this. By bringing trivial activities under the constitutional umbrella, we trivialize the constitutional provision itself. If we are to maintain the vitality of this new doctrine, we must be careful not to "cry wolf" at every minor restraint on a citizen's liberty. *See Whalen v. Roe*, 429 U.S. 589, 597, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).

The two other Courts of Appeals which have considered this issue have reached similar conclusions. In *Miller v. School District*, 495 F.2d 658 (7th Cir. 1974), the Seventh Circuit upheld a grooming regulation for teachers. Mr. Justice Stevens, then a member of the Court of Appeals, wrote:

Even if we assume for purposes of decision that an individual's interest in selecting his own style of dress or appearance is an interest in liberty, it is nevertheless perfectly clear that every restriction on that interest is not an unconstitutional deprivation.

From the earliest days of organized society, no absolute right to an unfettered choice of appearance has ever been recognized; matters of appearance and dress have always been subjected to control and regulation, sometimes by custom and social pressure, sometimes by legal rules. A variety of reasons justify limitations on this interest. They include a concern for public health or safety, a desire to avoid specific forms of antisocial conduct, and an interest in protecting the beholder from unsightly displays. Nothing more than a desire to encourage respect for tradition, or for those who are moved by traditional ceremonies, may be sufficient in some situations. Indeed, even an interest in teaching respect for (though not necessarily agreement with) traditional manners, may lend support to some public grooming requirements. Therefore, just as the individual has an interest in a choice among different styles of appearance and behavior, and a democratic society has an interest in fostering diverse choices, so also does society have a legitimate interest in placing limits on the exercise of that choice.

495 F.2d at 664 (footnotes omitted). The First Circuit reached the same result in *Tardif v. Quinn*, 545 F.2d 761 (1st Cir. 1976), where a school teacher was dismissed for wearing short skirts. In upholding the action of the school district, the Court stated:

[W]e are not dealing with personal appearance in what might be termed an individual sense, but in a bilateral sense—a contractual relationship. Whatever constitutional aspect there may be to one's choice of apparel generally, it is hardly a matter which falls totally beyond the scope of the demands which an employer, public or private, can legitimately make upon its employees. We are unwilling to think that every dispute on such issues raises questions of constitutional proportions which must stand or fall, depending upon a court's view of who was right.

545 F.2d at 763 (citations omitted).

Both *Miller* and *Tardif* are stronger cases for the plaintiff's position than the instant case.[14] Both involved dismissals rather than, as here, a reprimand. Moreover, *Miller* involved a regulation of hair and beards, as well as dress. Thus, Miller was forced to appear as his employers wished both on and off the job. In contrast, Mr. Brimley can remove his tie as soon as the school day ends. If the plaintiffs in *Miller* and *Tardif* could not prevail, neither can Mr. Brimley.

---

14. The claim that such regulations violate the Constitution has fared equally badly in the state courts. *See, e. g., Morrison v. Hamilton County Board of Education*, 494 S.W.2d 770 (Tenn.), *cert. denied*, 414 U.S. 1044, 94 S.Ct. 548, 38 L.Ed.2d 335 (1973); *Blanchet v. Vermi-* *lion Parish School Board*, 220 So.2d 534 (La. App.), *writ denied*, 254 La. 17, 220 So.2d 68 (1969); *but see Finot v. Pasadena City Board of Education*, 250 Cal.App.2d 189, 58 Cal.Rptr. 520 (1967).

Each claim of substantive liberty must be judged in the light of that case's special circumstances. In view of the uniquely influential role of the public school teacher in the classroom, the board is justified in imposing this regulation. As public servants in a special position of trust, teachers may properly be subjected to many restrictions in their professional lives which would be invalid if generally applied. *See James v. Board of Education*, 461 F.2d 566, 573 (2d Cir.), *cert. denied*, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972). We join the sound views of the First and Seventh Circuits, and follow *Kelley* by holding that a school board may, if it wishes, impose reasonable regulations governing the appearance of the teachers it employs. There being no material factual issue to be decided, the grant of summary judgment is affirmed.

OAKES, Circuit Judge (with whom Judge SMITH concurs) (dissenting):

In an area as fraught with uncertainty as constitutional law, it is particularly incumbent upon judges to explain carefully each analytical step they are making toward a particular conclusion and to evaluate searchingly each contention put forward by the parties. Reasoned analysis is particularly critical in a case of this nature, in which a school board, carrying the legitimacy of popular election, is claimed to infringe upon the liberty and expression interests of an individual employee who after exhausting mediation remedies seeks redress, in the time-tested constitutional framework, from the institution that has historically been charged with the task of guarding the individual's most precious freedoms against undue infringement by the majority. The en banc opinion, by downplaying the individual's interests here as "trivial" and giving weight to a school board interest not advanced as such, adds, it seems to me, an unfortunate chapter to this history. I dissent, with regret, not so much at the difference in value judgments that evidently underlies the majority's opinion but because the case apparently involves so little in the majority's view.

The panel majority opinion sought to follow a rather straightforward analysis: (1) appellant Brimley has a Fourteenth Amendment liberty interest in his personal appearance; (2) appellant also has a First Amendment interest, involving the right to teach; (3) the school board asserts three interests, two of which are invalid because *ultra vires* and the third of which (discipline) is not rationally furthered by this teacher dress code; (4) balancing these interests, appellant prevails. This dissent will discuss in the above order the treatment of each of these points in the en banc majority opinion.

First, since the en banc majority purports to follow *Kelley v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976), it presumably assumes, as did the Court in *Kelley, id.* at 244, 96 S.Ct. 1440, that appellant *does* have a Fourteenth Amendment liberty interest in his personal appearance, even if not a "fundamental" one. If the school board cannot put a proper purpose that is rationally related to its regulation on the other side of the scales, this liberty interest alone, however "trivial," will carry the day for appellant. *See Tardif v. Quinn*, 545 F.2d 761, 764 (1st Cir. 1976), *quoted in* panel majority op., *ante,* at 846 n.9; Perry, *Substantive Due Process Revisited: Reflections On (And Beyond) Recent Cases*, 71 Nw.U.L. Rev. 417, 427–30 (1976).

Second, the en banc majority baldly states in a footnote, without citation of authority, that appellant's asserted First Amendment right to teach is not a constitutionally cognizable interest. *Ante,* at 857 n.5. But this established constitutional right will not disappear because the en banc majority simply chooses to ignore it. It exists in full-blown form at the college level. *See, e. g., Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 628 (1967); *Barenblatt v. United States*, 360 U.S. 109, 129, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (plurality opinion). Teaching methods in public high schools are in many instances protectible under the

First Amendment, as the authorities cited by the panel majority demonstrate, *ante*, at 843, and as more recent authorities continue to affirm, *see Minarcini v. Strongsville City School District*, 541 F.2d 577, 582 (6th Cir. 1976); *Cary v. Board of Education*, 427 F.Supp. 945 (D.Colo.1977). While serious questions arise in measuring the parameters of the right in the context of public high school teaching, as the panel majority fully recognized, *ante*, at 843, answers to those questions are not aided by the ostrich-like presumption that they do not exist.

To be sure, the en banc majority does discuss at length symbolic speech, a concept quite separate from the right to teach. I do not disagree with the majority's conclusion that, to the limited extent that appellant is making a symbolic speech claim, it is close to the conduct end of the speech-conduct continuum. But even this conclusion still leaves appellant with a First Amendment constitutional interest that can be overcome only by a state regulation rationally related to a valid purpose.

Third, the en banc majority abandons two of the interests asserted by the school board,[1] presumably agreeing with the panel majority that they are outside the scope of the board's statutory powers, panel majority op., *ante*, at 845; concurs with the panel in identifying a third interest; and makes up a fourth of its own. I agree fully with the en banc majority that the third and last interest asserted by the board—involving discipline, respect, and decorum in the classroom—is a proper one. The point made by the panel majority was that this interest did not seem furthered in any rational way by the teacher dress code at issue here. The en banc majority opinion makes no attempt whatever to address this critical analytical point.[2] Instead, its logic appears to be: "The interest is furthered by the dress code because the school board says that it is." Whatever argument might be made that the school board's ends are furthered by its means, the en banc majority does not make it, and certainly the essential connection between means and ends is not here self-evident.[3] The majority's less than rigorous inquiry is well short of the least demanding formulation of the inquiry necessary to determine the rationality of a state regulation. *See, e. g., Maher v. Roe*, —— U.S. ——, ——, 97 S.Ct. 2394, —— L.Ed.2d —— (1977).

---

1. These were establishing "a professional image for teachers" and promoting "good grooming among students." *Ante*, at 844.

2. The panel majority opinion dealt with this interest as follows:

   It is far from clear . . . that a tie code like that in issue here has any connection with respect or discipline. Indeed, appellant puts forward the seemingly more reasonable proposition, which we must accept at this stage, that being tieless helps him to maintain his students' respect. Teenagers, who are so often rebellious against authority, may find a tieless teacher to be a less remote, more contemporary individual with whom they can more easily interact, and hence to whom they are better prepared to listen with care and attention. It is highly questionable, and certainly not established on this motion for summary judgment, that the Board's valid end of promoting discipline is substantially, or even incrementally, furthered by its tie regulation.

   *Ante*, at 845 (footnotes omitted). I see no reason to alter this view at this stage, which is still one of summary judgment.

3. By contrast, in *Kelley v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976), the connection was explicitly made between the hair regulation at issue and the state interests of discipline esprit de corps, and uniformity in the police force.

   The majority's statement, *ante*, at 861 n.12, that *Quinn v. Muscare*, 425 U.S. 560, 96 S.Ct. 1752, 48 L.Ed.2d 165 (1976) (per curiam), "points toward a general application of *Kelley* to all public employees" is simply not correct. *Quinn* involved a fire department appearance regulation, and the same state interests detailed in *Kelley* were involved, as the Court in *Quinn* recognized, *id.* at 562, 96 S.Ct. 1752. Even the en banc majority does not assert that the state has any interest in the discipline, esprit de corps, or uniformity of its teachers. Different state interests are involved here, and they must be balanced against appellant's asserted rights on their own merits. *See* Perry, *Substantive Due Process Revisited: Reflections On (And Beyond) Recent Cases*, 71 Nw.U.L. Rev. 417, 427–30 (1976).

The en banc majority also makes up an interest, respect for traditional values,[4] that is not put forward by the school board. I understand it to be settled constitutional doctrine that only objectives articulated by the State are to be used in considering whether a regulation is rational. *See, e. g., Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 314–15 & n.6, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) (per curiam) ("the purpose identified by the State"); *Johnson v. Robison*, 415 U.S. 361, 376, 94 S.Ct. 1160, 1170, 39 L.Ed.2d 389 (1974) ("whether there is . . . a fair and substantial relation to at least one of the stated purposes"); *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *McGinnis v. Royster*, 410 U.S. 263, 276–77, 95 S.Ct. 1055, 35 L.Ed.2d 282 (1973). *See also Schlesinger v. Ballard*, 419 U.S. 498, 520–21 & n.11, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975) (Brennan, J., dissenting); Gunther, *The Supreme Court, 1971 Term— Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv.L.Rev. 1 (1972). I had imagined that the day when courts supplied imaginary purposes for state regulations had passed.

The reason that the school board never asserted this interest, of course, is clear: the tie requirement is not related in any rational way to the admitted responsibility of a school board to inculcate traditional values in its students. The en banc majority does not enlighten us as to which value it has in mind, but in any event a necktie is a mere conventional fashion, with no connection of which I am aware to any traditional value. I fear that the majority simply confuses traditional values with mindless orthodoxy. The inculcation of the latter, of course, as the panel majority pointed out, is constitutionally forbidden. *Ante,* at 845 n.8.

Finally, the process by which the en banc majority balances the interests involved is defective. As Professor Gunther has pointed out, "responsible" balancing requires careful identification and separate evaluation of "each analytically distinct ingredient of the contending interests." Gunther, *supra*, 86 Harv.L.Rev. at 7. This the en banc majority fails to do. Rather, at the end of the majority's discussion of each of appellant's two interests, it simply states that a teacher dress code rationally promotes the two interests identified as those of the school board and hence overcomes the interests of appellant. Even if a rational connection between the tie regulation and board interests did exist, as to which see text at notes 2–3 *supra*, the majority's assumption that both of appellant's interests can be disposed of separately under a rational relationship test is in my view not well-founded. If only a Fourteenth Amendment liberty interest were at stake, such a test might be the proper one to apply. *See Kelley v. Johnson, supra; Tardif v. Quinn, supra; Miller v. School District No. 167*, 495 F.2d 658 (7th Cir. 1974) (Stevens, J.).[5] When, instead, a First Amendment interest is asserted, there must in addition be some inquiry by the court into whether the state had available " 'less drastic means for achieving the same basic purpose.' " *Wooley v. Maynard,* 430 U.S. 705, 716–717, 97 S.Ct. 1428, 1436, 51 L.Ed.2d 752 (1977), *quoting Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *see James v. Board of Education,* 461 F.2d 566, 574, 575 n.22 (2d Cir.), *cert. denied,* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972), *quoted in* panel majority op., *ante,* at 846. The necessary implication of *James* is that a less drastic means test must be applied even when it is a public employee

---

**4.** Respect for "authority" is also mentioned, but I assume that this refers to the maintenance of discipline or to the inculcation of a traditional value.

**5.** The en banc majority's claim that *Miller* and *Tardif* were stronger cases than the instant one for appellant's position, because "[b]oth in-

volved dismissals rather than, as here, a reprimand," *ante,* at 862, is groundless. The only reason that appellant was not dismissed is because, rather than defy the tie code, he chose to comply with it and make his challenge through the proper legal channels. *See* panel majority op., *ante,* at 840.

who is asserting the First Amendment claim. *See* 461 F.2d at 571–72 & n.13.

When an individual has more than one constitutional interest at stake, at least when one involves the First Amendment, a higher degree of scrutiny is required.[6] In *Police Department of City of Chicago v. Mosley*, 408 U.S. 92, 98–99, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), for example, the Supreme Court "carefully scrutinized" justifications for selective prohibitions against picketing near schools under the equal protection clause because expressive conduct within the protection of the First Amendment was involved; the governmental interest served by the regulation was therefore required to be "substantial." Only in this way, with the interests on each side aggregated rather than viewed separately, can any meaningful balancing take place. If, instead, the en banc majority's pro forma, sequential "balancing" is all that is required, a new and dimmer day is dawning, at least for public employees, and perhaps more broadly for all forms of constitutional adjudication involving individual rights.

I think the en banc majority gives away the real basis for its simple bow in the direction of balancing when it suggests that to hold otherwise is to give federal judges "a 'roving commission' to right wrongs and impose our notions of sound policy upon society." *Ante,* at 862. I had always thought that the federal courts were given by Article III of the Constitution and the doctrine of judicial review not a "roving commission" but a sworn duty to interpret and uphold that document equally for all who come before them. Constitutional doctrines have evolved that we may be aided in this awesome task, and, in my view, we must strive with as much intellectual clarity as possible to apply those doctrines to the case at hand. It is when we do not do this that we are truly imposing our own notions of sound policy on society, for our conclusions are then rooted in the shifting sands

of our own prejudices and not in the rich, well-furrowed soil of the Document we are sworn to interpret. An individual's rights in this sense can never be "trivial." They are constitutionally based or they are not; they are opposed by rational state interests or they are not; they prevail in the balancing process or they do not. Here, they should prevail.

I dissent.

**6.** This is a common technique in the equal protection area, where "strict scrutiny" is mandated when a claim of unequal treatment is combined with a claim that a fundamental interest is implicated. This is not to say, however, that appellant's interest here is "fundamental" in the equal-protection-analysis sense or that "strict scrutiny" is required.